301 P.3d 211

**ROBERTO F., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, L.F., I.A., Tracie H., Jimmy S., Appellees.**

**No. 1 CA–JV 11–0253.**

Court of Appeals of Arizona,
Division 1, Department D.

April 30, 2013.

As Amended June 20, 2013.

Thomas C. Horne, Attorney General By Amanda Holguin, Assistant Attorney General, Mesa, Attorneys for Appellee.

Diane S. McCoy, Mohave County Appellate Defender, Kingman, Attorneys for Appellant/Father Roberto F.

Kelley Moss & Holden PLLC By Michele Holden, Bullhead City, Attorney for Appellee/Intervenors Tracie H. and Jimmy S.

Knudtson Law LLC By Lenore Knudtson, Kingman, Guardian Ad Litem for Children.

## OPINION

GOULD, Judge.

¶1 In this case, we vacate a judgment terminating the natural father's ("Father") parental rights to his children, L.F. and I.A. (collectively, the "Children"). Our review of the record shows the evidence was insufficient to support termination. In addition, the trial court erred by terminating Father's parental rights based, in part, on a theory of abandonment that was not disclosed until the fourth day of a five-day trial.

¶2 In reaching our decision, we also address whether the trial court erred in permitting intervention by a foster parent in a dependency case. Although we ultimately affirm the trial court's exercise of discretion in allowing foster parents to intervene, we discuss the potential prejudicial effects of such intervention.

### Factual and Procedural Background

¶3 L.F. was born in Arizona in February 2005. In the months preceding her birth, Father was incarcerated in California. After L.F. was born, Father was released and applied for a transfer under an interstate compact in order to serve his parole in Arizona to be with his daughter. However, when his application "didn't work out," Father came to Arizona anyway. In taking this action, Father explained, "I wasn't going to leave my daughter." Thus, approximately one month

after L.F. was born, Father was living with L.F. and Mother in Arizona.

¶ 4 Father, Mother, and L.F. lived together in Arizona for two years. The family later moved to California where, after approximately one year, Mother and Father separated. At the time of their separation, Mother was six months pregnant with their second child, I.A. Mother eventually left California and moved back to Arizona with L.F. In April 2009, approximately one week after Mother moved back to Arizona, Father was arrested and incarcerated in California for violating his parole because he had earlier moved to Arizona without permission.

¶ 5 In June 2009, I.A. was born substance-exposed to methamphetamine, and both L.F. and I.A. were removed from Mother's care and custody by the Arizona Department of Economic Security ("ADES"). A few days later, the Children were placed in a foster home with Tracie H. and Jimmy S. ("Foster Parents") and ADES filed a dependency petition. As to Father, the petition alleged that Father was "incapable of exercising parental care and control of either child because he is imprisoned . . . in California."

¶ 6 On July 16, 2009, Father was served with the dependency petition while incarcerated in California. When Father was released from prison a few days later, he immediately violated his parole by drinking alcohol. Approximately three days later, Father's parole officer gave him the choice between either returning to prison or enrolling in a year-long substance abuse program in California; Father chose to enter the California substance abuse program.

¶ 7 Father finished the substance abuse program in June 2010, but, according to Father, was not allowed to leave California until he finished his parole in November 2010. A few weeks after completing his parole, in December 2010, Father returned to Arizona to "fight for his kids."

¶ 8 While Father was attending the substance abuse program in California, the dependency proceeding was pending in Arizona. From its inception, the ADES case plan focused on returning the Children to their parents. In June 2010, the court conducted a permanency planning hearing and ordered a primary case plan of family reunification with a concurrent case plan of severance and adoption. This plan was affirmed by the court in September 2010.

¶ 9 When Father returned to Arizona in December 2010, the primary case plan remained family reunification. However, at a hearing held in January 2011, the State and the Guardian ad Litem ("GAL") for the Children advised the court there was a disagreement about the case plan. The State continued to believe family reunification was the correct case plan, while the GAL expressed concerns regarding reunification.[1] After considering the positions of the State and the GAL, the court decided the case plan would remain family reunification.

¶ 10 In early February 2011, approximately three weeks after the court affirmed the reunification plan, Foster Parents moved to intervene in the dependency proceedings. Foster Parents also filed a separate termination petition seeking to sever the parental rights of Mother and Father.[2] The motion to intervene was opposed by ADES, Mother, and Father, but supported by the GAL and the Children's attorney.

¶ 11 The court granted Foster Parents' motion to intervene. The court found that Foster Parents had a conditional right to intervene based on Arizona Rule of Civil Procedure 24(b)(1) and Arizona Revised Statute ("A.R.S.") section 8–530(A). It also found that because Foster Parents stood *in loco parentis* to the Children, based on

---

1. Later, the Court Appointed Special Advocate ("CASA") filed papers indicating that he supported changing the plan to severance and adoption. ADES subsequently filed papers supporting the family reunification case plan.

2. This separate termination action was filed as Mohave County Superior Court Case No. SV 2011–04001. Foster Parents filed their Petition to Terminate Parent–Child Relationship based on A.R.S. § 8–533(A), which provides that "[a]ny person or agency that has a legitimate interest in the welfare of a child, including, but not limited to . . . a foster parent . . . may file a petition for the termination of the parent-child relationship . . . ."

A.R.S. § 25–415 (West 2011) (now codified as amended at A.R.S. § 25–409) and *Bechtel v. Rose*, 150 Ariz. 68, 722 P.2d 236 (1986), intervention was permitted under Rule 24(b)(2).

¶ 12 After the court granted Foster Parents' motion to intervene, two important developments occurred in the dependency case. First, the State's focus on family reunification changed from Mother to Father. In early March 2011, Mother relapsed in her substance abuse treatment and tested positive for methamphetamine. Despite Mother's relapse, ADES reported that Father had demonstrated that he was able to parent and maintain a "loving and stable environment" for the Children. In response, Father, who had been living with Mother, left her and moved into his own home.[3]

¶ 13 The second important development was that notwithstanding CPS' positive comments about Father, the direction of Father's dependency case immediately changed from reunification to severance. In late March 2011, the court held a supplemental permanency planning hearing in the dependency case and an initial appearance on Foster Parents' petition to sever in the termination case. At this hearing, the court consolidated Foster Parents' termination case with the dependency case. During the hearing the court commented it was "not necessarily noticing any 'progress[,]'" and "[w]ith that and given the age of the children, the Court finds it appropriate to change the case plan to severance and adoption by a nonrelative." The court then directed the children's attorney or the GAL to file "an appropriate motion" to change the case plan from reunification to severance and adoption. Children's attorney orally moved to join in the Foster Parents' Petition to Sever, and the court granted the motion.

¶ 14 The consolidated case proceeded to trial over five separate trial days, concluding in early November 2011. The trial pitted the State and Father arguing against severance and for reunification against the Foster Parents and the GAL arguing for severance. Late in the afternoon of the fourth (and second to last) day of trial, Foster Parents moved to amend their petition to include abandonment as a ground for severance. The State and Father objected to the amendment as untimely. Nonetheless, the court allowed the amendment.

¶ 15 At the end of the trial the court terminated Father's parental rights to the Children on the grounds of abandonment and 15 months time-in-care.[4] Father timely appeals.

### Discussion

¶ 16 Father contends the trial court abused its discretion by allowing Foster Parents to intervene in the dependency proceeding. In addition, Father asserts the court committed reversible error in terminating his parental rights based on 15 months time-in-care and abandonment. *See* A.R.S. § 8–533(B)(1); A.R.S. § 8–533(B)(8)(c).

### I. Intervention

¶ 17 We review rulings granting or denying a motion to intervene for an abuse of discretion. *Allen v. Chon–Lopez*, 214 Ariz. 361, 364, ¶ 9, 153 P.3d 382, 385 (App.2007). Under this standard of review, we do not substitute our judgment for that of the trial court, and "will sustain the trial court's ruling on any theory supported by the evidence, even though the trial court's reasoning may differ from our own." *Univ. Mech. Contractors v. Puritan Ins. Co.*, 150 Ariz. 299, 301, 723 P.2d 648, 650 (1986).

---

3. Foster Parents allege that Father was aware Mother was using illegal drugs during the time Father and Mother were living together and were exercising unsupervised visitation with the Children. Father disagrees, asserting that he reported his suspicions regarding Mother's drug use to a case worker before Mother tested positive for methamphetamine, and that once Mother's drug use was confirmed, he moved to a separate residence.

4. When Mother failed to appear on the second day of trial, the court found she waived her rights and was deemed to have admitted the allegations against her. At the end of the trial, the court terminated Mother's parental rights pursuant to A.R.S. § 8–533(B)(8)(a)–(c).

¶ 18 "To justify the reversal of a case, there must not only be error, but the error must have been prejudicial to the substantial rights of the party." *Creach v. Angulo,* 189 Ariz. 212, 214, 941 P.2d 224, 226 (1997) (quoting with approval *Creach v. Angulo,* 186 Ariz. 548, 550, 925 P.2d 689, 691 (App.1996)); *see Bob H. v. Ariz. of Dep't Econ. Sec.,* 225 Ariz. 279, 283, ¶ 16, 237 P.3d 632, 636 (App.2010) (explaining that a "denial of due process of law so gross as to lack a necessary attribute of a judicial determination" constituted reversible error). Reversible error will not be presumed, but must be found to exist in the record. *Ariz. Dep't of Econ. Sec. v. Valentine,* 190 Ariz. 107, 110, 945 P.2d 828, 831 (App. 1997).

¶ 19 Foster Parents were required to obtain court approval to intervene because absent intervention, as foster parents they were "participants," not "parties," in the dependency proceeding. *See* Ariz. R.P. Juv. Ct. 37(A),(B) (including foster parents under the definition of "[p]articipants" in dependency proceedings, but not under the definition of "[p]arties")[5]; *Juv. Action No. J–64016,* 127 Ariz. 296, 298 n. 2, 619 P.2d 1073, 1075 n. 2 (App.1980) (refusing to consider an amicus brief filed by foster parents; "[a]lthough [foster parents] were permitted to actively participate in the proceedings below, they are not parties.").

¶ 20 We construe Rule 24 liberally, " 'with the view of assisting parties in obtaining justice and protecting their rights.' " *Bechtel,* 150 Ariz. at 72, 722 P.2d at 240 (quoting *Mitchell v. City of Nogales,* 83 Ariz. 328, 333, 320 P.2d 955, 958 (1958)). Intervention may be permissive or as of right. Ariz. R. Civ. P. 24(a), (b). Intervention as of right is governed by Rule 24(a), whereas permissive intervention is governed by Rule 24(b).

¶ 21 Foster Parents do not argue they possess a right to intervene in Father's de-

pendency case based on Rule 24(a). Rather, Foster Parents contend the trial court properly granted their motion to intervene on a permissive basis pursuant to Rule 24(b).

¶ 22 Rule 24(b) provides that, in the discretion of the trial court, "anyone may be permitted to intervene in an action" when (1) "a statute confers a conditional right to intervene" or (2) "an applicant's claim or defense and the main action have a question of law or fact in common." Ariz. R. Civ. P. 24(b). If the requirements for permissive intervention are satisfied, a "court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*

¶ 23 Depending on the circumstances of a case, a foster parent may, on the basis of permissive intervention, seek to intervene as a party in a dependency case. In defining the term "party" in reference to dependency proceedings, Ariz. R.P. Juv. Ct. 37(A) states "a party to the action means a child, parent, guardian, [ADES] or petitioner, and *any other person* or entity who has been permitted to *intervene* pursuant to Rule 24, Ariz. R. Civ. P[.]" (emphasis added). Clearly, the phrase "any other person" is broad enough to include intervention by a foster parent.

### A. Permissive Intervention: Conditional Right Pursuant to Rule 24(b)(1)

■ ¶ 24 The trial court found that based on A.R.S. § 8–530,[6] also known as the Foster Parents' Bill of Rights, Foster Parents had a conditional right to intervene in Father's dependency case pursuant to Rule 24(b)(1). We disagree. The Foster Parents' Bill of Rights does not address *whether* a foster parent has the right to intervene in a dependency case. *See* A.R.S. § 8–530(A). We assume that if the legislature had desired to create a right to intervene for foster parents,

---

5. In the context of juvenile court proceedings, several rights are accorded to "parties" that are not necessarily accorded to "participants," including (generally) a right to counsel, A.R.S. § 8–841(D)(4); a right to file motions, *see* Ariz. R.P. Juv. Ct. 46(A); a right to take discovery and disclosure and attendant responsibilities, *see* Ariz. R.P. Juv. Ct. 44; and a right to present a case (by calling and examining witnesses), *cf.* A.R.S. § 8–843(B)(2)–(4). A "participant's"

presence at hearings may also, if appropriate, be restricted in a way not applicable to parties. *See, e.g.,* Ariz. R.P. Juv. Ct. 41(C).

6. The specific provision relied upon by the court was A.R.S. § 8–530(A)(5) (West 2012), which provides foster parents with the right "[t]o contribute to the permanency plan for the child in the foster home."

it would have done so. *See In re Marriage of Downing*, 228 Ariz. 298, 300, ¶ 7, 265 P.3d 1097, 1099 (App.2011) (explaining that "we assume 'the legislature has said what it means' ") (quoting *Hughes v. Jorgenson*, 203 Ariz. 71, 73, ¶ 11, 50 P.3d 821, 823 (2002)).

¶ 25 Likewise, the rules regarding dependency proceedings do not convey such a right. Arizona Rule of Procedure for the Juvenile Court 41(I)(B) expressly states the right of a foster parent to notice and an opportunity to be heard at a proceeding involving a child in foster care "shall *not* require that any foster parents ... be made a *party* to such a proceeding." (Emphasis added.)

¶ 26 The trial court also found that A.R.S. § 25–415(A) (West 2011) (now A.R.S. § 25–409(A)),[7] when interpreted in light of our supreme court's decision in *Bechtel*, 150 Ariz. at 72, 722 P.2d at 240, provided a conditional right for Foster Parents to intervene under Rule 24(b)(1). In reaching this conclusion, the court determined that Foster Parents stood *in loco parentis* to the Children based on the amount of time the Children had lived with them in foster care.

¶ 27 The trial court erred in concluding Foster Parents had a conditional right to intervene pursuant to Rule 24(b)(1). Neither A.R.S. § 25–409(A) nor *Bechtel* creates a conditional right for a foster parent to intervene in a dependency case. Section 25–409(A) permits a non-parent standing "in loco parentis" to a child to initiate a Title 25 child custody proceeding; it does not address intervention in a Title 8 dependency case. Moreover, the decision in *Bechtel* was not based on A.R.S. § 25–415 or the concept of "in loco parentis."

¶ 28 In *Bechtel*, ADES assumed care and custody of a child after the child's mother was killed in an auto accident. *Bechtel*, 150 Ariz. at 70, 722 P.2d at 238. ADES instituted a dependency proceeding, and a few weeks later the child's father formally relinquished his parental rights to the child. *Id.*

As a result, there was no longer a parent involved and reunification with a parent was impossible. *Id.* The child's grandmother moved to intervene in the dependency proceeding, but the trial court summarily denied her motion to intervene. *Id.*

¶ 29 Our supreme court found that the trial court had abused its discretion and remanded, noting that "the tenor of Arizona's legislative and judicial decisions, as well as sound public policy," favors the important role of grandparents in maintaining the "integrity of the family." 150 Ariz. at 74–75, 722 P.2d at 242–43. In light of this policy consideration and the fact there were no parents involved in the dependency, *Bechtel* noted " 'courts should bend over backwards, if possible, to maintain the natural ties of birth,' " and grandparents "should be allowed to intervene in the dependency process unless a specific showing is made that the best interest of the child would not be served thereby." 150 Ariz. at 73, 722 P.2d at 241 (citing *Anonymous v. Anonymous*, 25 Ariz.App. 10, 11, 540 P.2d 741, 742 (1975)).[8]

¶ 30 The present case bears no resemblance to *Bechtel*. Here, Foster Parents sought to terminate, not preserve, the parental rights of the natural Father. Moreover, unlike *Bechtel*, in this case the natural Father, with the support of the State, actively participated in the dependency and sought to regain custody of his Children. *See also Maricopa County Juv. Action No. JS–7135*, 155 Ariz. 472, 747 P.2d 633 (App.1987) (holding that trial court properly denied grandparents' motion to intervene because the child was not "parentless or in any way 'bereft of family,' " both parents were living and actively seeking custody, the State was not "attempting to assert custody or guardianship rights superior to the natural ties between the child and its family," and there was "no issue nor even the suggestion of a non-familial placement of the child"); *Allen*, 214 Ariz. at 364–65, ¶ 11, 153 P.3d at 385–86 (holding trial court erred in denying aunt's

---

7. Under A.R.S. § 25–401(1), the phrase "in loco parentis" is defined as "a person who has been treated as a parent by the child and who has formed a meaningful parental relationship with the child for a substantial period of time."

8. The supreme court added that "other relatives might also be accorded intervention should the need and propriety of their intervention be demonstrated." 150 Ariz. at 73 n. 3, 722 P.2d at 241.

motion to intervene in a dependency case where aunt was a member of child's family and, although the child was not technically parentless, his parents had "consistently avoided their parental obligations").

## B. Permissive Intervention Under Rule 24(b)(2): Common Issues of Law or Fact

¶ 31 Foster Parents also contend the trial court properly granted their motion to intervene pursuant to Rule 24(b)(2), on the ground there were common questions of law and fact between the Foster Parents' termination petition and the dependency proceeding.[9] Father argues that Foster Parents cannot "manufacture" common questions of law and fact to satisfy Rule 24(b)(2) by filing a separate termination action. Father also argues family reunification was the existing case plan in the dependency case and, therefore, the dependency case shared no common issues of law or fact with Foster Parents' termination case.

¶ 32 We conclude the trial court did not abuse its discretion in determining there were common issues of law and fact. When Foster Parents filed their termination petition, the primary case plan in the dependency case was reunification; however, there was also a concurrent case plan of severance and adoption. In addition, the issue of termination had already been raised by the GAL, and might have been raised again during the course of the dependency proceeding.

## C. *Bechtel* Factors

■ ¶ 33 In addition to establishing grounds for intervention under Rule 24, any third party seeking intervention in a dependency case must show that intervention is in the child's best interests. *Bechtel,* 150 Ariz. at 73, 722 P.2d at 241; *Allen,* 214 Ariz. at 365, ¶ 12, 153 P.3d at 386. In making such a determination, courts must weigh and consid-

er a number of factors, referred to as the "*Bechtel* factors." *Allen,* 214 Ariz. at 365, ¶¶ 12–13, 153 P.3d at 386. These factors are: (1) "the nature and extent of the intervenors' interest" in the dependency case, (2) the intervenors' "standing to raise relevant issues" in the dependency case, (3) the legal position the interveners "seek to advance, and its probable relation to the merits of the case," (4) "whether the interveners' interests are adequately represented by other parties" already present in the litigation, (5) "whether intervention will prolong or unduly delay the litigation," and (6) "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Bechtel,* 150 Ariz. at 72, 722 P.2d at 240 (quoting *Spangler v. Pasadena Bd. Educ.,* 552 F.2d 1326, 1329 (9th Cir.1977)).

¶ 34 In granting Foster Parents' motion to intervene, the trial court did not expressly analyze the *Bechtel* factors, nor did it make any findings regarding these factors. Nonetheless, we must assume the trial court considered each *Bechtel* factor that was necessary to grant the motion to intervene. *Horton v. Mitchell,* 200 Ariz. 523, 526, ¶ 13, 29 P.3d 870, 873 (App.2001) (When the trial court does not make specific findings of fact, "we 'must assume that the trial court found every fact necessary to support its [ruling] and must affirm if any reasonable construction of the evidence justifies the decision.' ") (internal citations omitted); *In the Matter of CVR 1997 Irrevocable Trust,* 202 Ariz. 174, 177, ¶ 16, 42 P.3d 605, 608 (App.2002) ("Because there are no findings of fact or conclusions of law, we presume that the trial court found every fact necessary to sustain its ruling and will affirm if any reasonable construction of the evidence supports its decision."). Thus, we review the record to determine if there was reasonable evidence

---

9. Father did not object to the trial court's order consolidating the dependency and severance actions, and Father does not raise this issue on appeal. As a result, we do not reach this issue in our decision. However, we note that consolidation, like permissive intervention, also turns on whether the separate actions involve common questions of fact, unnecessary delay, and preju-

dice to the parties. Ariz. R. Civ. P. 42(a), (b); *Marvin Johnson, P.C. v. Myers,* 184 Ariz. 98, 102, 907 P.2d 67, 71 (1995). Thus, many of the same factors that apply to Foster Parent's motion to intervene would also apply to the trial court's decision to consolidate Foster Parents' severance action with the State's dependency action.

supporting the trial court's implicit determination that the *Bechtel* factors weighed in favor of intervention. *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 254, ¶ 10, 63 P.3d 282, 284 (2003) ("We defer to the judge with respect to any factual findings explicitly or implicitly made, affirming them so long as they are supported by reasonable evidence.").

¶ 35 Our review of the record shows that the parties already involved in the dependency case were able to adequately and objectively look out for the best interests of the Children. At the time of Foster Parents' intervention, the State, through the Assistant Attorney General and ADES, and the Children, through their attorney and the GAL, were already parties to the case. In addition, the Foster Parents were participants with a right to attend and participate in dependency and review hearings. Nothing in the record leads us to conclude that these parties and participants, absent intervention by Foster Parents, were unable or unwilling to fully promote and protect the best interests of the Children.

¶ 36 However, there is reasonable evidence in the record supporting at least some *Bechtel* factors that weigh in favor of intervention. Foremost among these factors was the Foster Parents' significant relationship with the Children and their desire to protect the Children, which the trial court could have reasonably viewed as potentially contributing to the "full development of the underlying factual issues" in the dependency case. *Bechtel*, 150 Ariz. at 72, 722 P.2d at 240.

¶ 37 When competing factors such as those discussed above guide a court's exercise of discretion, it is rare that an appellate court will find an abuse of discretion. Although we may not have made the same decision as the trial court, we are unable to find such an abuse of discretion here.

**D. Prejudice**

¶ 38 Assuming, as we must, that the *Bechtel* factors supported intervention, the trial court was still required to consider the potential prejudice that Father faced by the decision to allow Foster Parents to intervene. Ariz. R. Civ. P. 24(b). At the heart of this contentious litigation was a conflict between Foster Parents and Father in their competing desires to gain custody of the Children. Under these circumstances, and given Father's strong constitutional interests in maintaining his parental relationship with his Children, it was incumbent on the trial court to carefully assess the potential prejudice Father might suffer by such intervention.[10] *Smith v. Org. of Foster Families for Equality and Reform, et al.*, 431 U.S. 816, 846–47, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (stating that "[w]hatever liberty interest might otherwise exist in the foster family as an institution, that interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents").[11] Although the trial court

---

10. Some courts have expressed substantial concerns about allowing intervention in a dependency by a foster parent because such intervention "has a tendency to shift the focus of the proceeding from the ability of the natural parent to care for the child to a comparison of the natural parent to the foster parent." *In re Custody of A.F.J.*, 161 Wash.App. 803, 815, ¶ 29, 260 P.3d 889, 896 (Wash.App.2011). *See also In re Juvenile Appeal Docket No. 10718*, 188 Conn. 259, 262–63, 449 A.2d 165, 167 (1982) (allowing intervention by a foster parent may "introduce an impermissible ingredient" by tempting judges or social workers to consciously or unconsciously "compare unfavorably the material advantages of the natural parents with those of the prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria.").

11. We have recognized that "[a] parent's right to 'the companionship, care, custody, and manage-

ment of his or her children' is a fundamental, constitutionally protected right, as is the right of association with one's children." *Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 200, ¶ 8, 42 P.3d 1163, 1165 (App.2002) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)) (internal citations omitted). Because the right to parent is so fundamental, we do not take severance lightly; "[i]t is not a parent's burden to prove she will be capable of parenting effectively in the near future, but ADES's burden to prove there is a substantial likelihood she will not." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 97, ¶ 33, 219 P.3d 296, 307 (App.2009). Accordingly, "'termination of the parent-child relationship ... should be resorted to only when concerted effort to preserve the relationship fails.'" *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046, 1053 (App.1999) (*citing Dep't of*

made no express findings regarding the potential for prejudice, we again assume the court considered this issue and found every fact necessary to grant the motion to intervene.[12] *See supra* ¶ 34.

¶ 39 The trial court's decision to permit intervention clearly prejudiced Father's efforts to reunite with his Children. When Foster Parents filed their motion to intervene, Father was attempting to show both the State and the court that he was willing and able to care for the Children. The State, for its part, fully supported family reunification as a case plan, and encouraged Father's efforts to regain custody of the Children.[13] The interests of the Foster Parents, however, were contrary to Father's interests; Foster Parents did not support the case plan and wanted to adopt the Children. Thus, once Foster Parents were admitted as a party, Father (and the State) faced a new adversarial party that was strongly opposed to reunification.

¶ 40 Nonetheless, based on our review of the record, we are unable to conclude that the trial court abused its discretion. The trial court could have reasonably determined that Foster Parents had a significant relationship with the Children, and it was therefore beneficial to the Children for the Foster Parents to intervene. Based on this determination, it was within the trial court's discretion to conclude that any prejudice suffered by Father was outweighed by the best interests of the Children.

## II.  Grounds for Severance

¶ 41 We next examine whether reasonable evidence supported termination based on abandonment and/or time-in-care. Termination of the parent-child relationship is warranted if at least one of the statutory grounds alleged is supported by clear and convincing evidence and termination is in the best interests of the child. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶¶ 3–4, 53 P.3d 203, 205 (App.2002).[14] In reviewing the record, we "accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Id.* at ¶ 4.

■ ¶ 42 In any severance proceeding, the material issue facing the court is whether a parent has the ability to properly parent his/her child; it is irrelevant whether a child has a stronger attachment to their foster parents, whether foster parents are more "nurturing," or whether foster parents might be more capable or better parents than a natural parent. *See Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App.1998) (explaining that when analyzing severance, "the juvenile court [does not] weigh alternative placement possibilities to determine which might be better"). As the United States Supreme Court explained, "[t]he State's interest in finding the child an alternative permanent home arises only 'when it is clear that the natural parent cannot or will not provide a normal family home for the child.'" *Santosky v. Kramer*, 455 U.S. 745, 767, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoted by *Maricopa County Juv. Action No. JS–7359*, 159 Ariz. 232, 236, 766 P.2d 105, 109 (App.1988)).

*Econ. Sec. v. Mahoney*, 24 Ariz.App. 534, 537, 540 P.2d 153, 156 (1975)).

12.  The trial court did address the potential for "undue delay" as required by Rule 24(b) by noting that it "would find that any delay that has resulted [because of] this motion [to intervene] is likely beneficial and not a detriment to permanence." The trial court did not indicate to whom such delay was "likely beneficial." Although we defer to the court as to this finding, we note that after Foster Parents intervened, another eight months passed before the court finished the severance trial and issued its termination order. Nonetheless, we will not speculate as to whether the case would have been resolved sooner absent the presence of Foster Parents,

e.g., whether the State would have dismissed the dependency case and the Children would have been returned to their Father.

13.  Throughout the trial, the State argued that Father was compliant with all services, that he was "ready, willing, and able to exercise proper and effective care and control" of the Children, and that the State believed ADES should be permitted to place the Children in Father's home.

14.  Given our holding that the trial court erred in finding a statutory ground was proven, we vacate and need not (and expressly do not) discuss the best interests finding.

## A. Abandonment

¶ 43 Father argues that Foster Parents' amendment adding abandonment was untimely and violated his due process right to proper notice. Father contends that given the timing of Foster Parents' amendment, he did not have sufficient time to prepare an adequate defense to the abandonment allegation. *Maricopa County Juv. Action No. JS–501904*, 180 Ariz. 348, 355, 884 P.2d 234, 241 (App.1994).

¶ 44 Adequate notice is a fundamental element of due process. *State v. Branch*, 108 Ariz. 351, 355, 498 P.2d 218, 222 (1972). A severance trial "shall be as informal as the requirements of due process and fairness permit and shall generally proceed in a manner similar to the trial of a civil action before the court without a jury." Ariz. R.P. Juv. Ct. 66(D); *see also Comeau v. Ariz. State Bd. Of Dental Exam'rs*, 196 Ariz. 102, 108, ¶ 28, 993 P.2d 1066, 1072 (App.1999) ("Due process requires prior notice of the charges so that the accused has a meaningful opportunity for explanation and defense."). While "[l]eave to amend shall be freely given when justice requires[,]" Ariz. R. Civ. P. 15(a)(1)(B), the critical factors in making this determination are "notice and substantial prejudice to the opposing party." *JS–501904*, 180 Ariz. at 355, 884 P.2d at 241 (internal citations omitted). We review a trial court's decision to grant a motion to amend for an abuse of discretion. *Id.*

¶ 45 Here, Father suffered substantial prejudice because he did not receive notice concerning the abandonment ground until the very end of the trial. In objecting to the amendment, the State pointed out to the court, "[t]he trial is already in its fourth day at this point. It's extremely late to amend the petition at this point. We've already had testimony from a number of people. We have had exhibits entered. This is extremely untimely." Father joined the State's objection.

¶ 46 Foster Parents contend they properly amended their petition to conform to the evidence presented at trial. *See* Ariz. R. Civ. P. 15(b) (allowing amendments to conform to the evidence when "issues not raised by the pleadings are tried by express or implied consent of the parties"). Foster Parents argue that many of the facts supporting abandonment were already alleged in their petition, and that their new legal theory of abandonment "only became clear" after Father testified at trial.

¶ 47 Contrary to Foster Parents' assertions, the record shows that abandonment was not an issue "tried by express or implied consent of the parties." Ariz. R. Civ. P. 15(b). Prior to the amendment, there was no legal or factual allegation in either the dependency petition or the termination petition alleging Father had abandoned the Children. As Foster Parents concede in their answering brief, it did not occur to them that abandonment might be a ground for termination until Father testified at trial. If it did not occur to them, it is unreasonable to assume that it should have occurred to Father and that he should have been prepared to mount a defense to this charge. Moreover, Father and the State timely objected to the requested amendment.

¶ 48 Foster Parents also argue that Father was not prejudiced by the timing of their amendment because there was sufficient time to address the abandonment allegation during trial. Foster Parents contend that the fifteen-day break between the date of the amendment (October 19) and the date when trial resumed (November 3) provided Father with "more than adequate time to rehabilitate his own testimony."

¶ 49 However, in making this argument, Foster Parents are attempting to shift the blame for their own untimeliness. The fifteen-day window did not alleviate the prejudice suffered by Father.[15] In order to prepare a defense to the abandonment claim, Father would have had to do more than simply re-take the stand and rehabilitate his

---

15. Father argues that he should have had at least thirty days prior to trial to prepare for this additional ground for severance, given that Rule of Procedure for Juvenile Court 48(E) requires this period of time for amendments to dependency petitions, and severance is a much harsher outcome than a finding of dependency. *See also* Ariz. R.P. Juv. Ct. 44(F) (requiring disclosure of all evidence no later than 10 days before a termination proceeding). We agree.

prior testimony. In support of its finding of abandonment, the trial court stated it "[did] not buy, without direct evidence," that Father's parole in California "was a legal impediment" to Father returning to Arizona "until November of 2010." Thus, in order to address the court's finding, it may have been necessary for Father to obtain out-of-state documents and subpoenas for corrections officers/officials and parole records located in California. In addition, Father may have needed to subpoena Mother and other witnesses to address Father's contacts with the children during the time he was serving his parole in California, as well as any support Father provided to Children.[16]

¶ 50 We conclude the court erred when it allowed the amendment. The amendment was untimely, and Father was substantially prejudiced. Under these circumstances, Father was denied his due process right to notice and the opportunity to prepare a defense regarding the abandonment allegation.

## B. Fifteen Months Time–in–Care
### 1. Legal Standard

¶ 51 The court also severed Father's parental rights based on fifteen months time-in-care pursuant to A.R.S. § 8–533(B)(8)(c). Subsection (B)(8)(c) requires a finding that all four of the following criteria be satisfied: (1) the children have been in an out-of-home placement for fifteen months or longer, (2) the agency has made diligent efforts to provide appropriate reunification services, (3) the parent is unable to remedy circumstances of placement, and (4) there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8), (B)(8)(c).

¶ 52 At trial, there was no dispute that the first criterion was satisfied; the Children were in an out-of-home placement for fifteen months or longer, from June 2009 through the end of trial in November 2011. However, Father and the State disputed the existence of the remaining elements. Although the court made several statements suggesting that the evidence supporting the time-in-care ground was weak,[17] the court ultimately decided Foster Parents satisfied their burden of proof as to the remaining criteria.

### 2. Diligent Efforts by ADES to Provide Appropriate Reunification Services

¶ 53 In support of its decision to sever Father's parental rights, the court found that despite the diligent efforts of ADES to provide reunification services to Father, Father did not complete the classes required by ADES under his case plan. The court made this finding even though the State submitted evidence showing that Father was compliant with ADES' reunification case plan, and argued that Father was compliant. The court appears to have relied on evidence presented by Foster Parents and the GAL questioning whether Father's classes with New Hope Ministries in California were sufficient to satisfy the case plan.

¶ 54 Assuming without deciding the New Hope Ministry classes were deficient and failed to satisfy the requirements of ADES' case plan, any fault in this regard lies with ADES, not Father. Pursuant to A.R.S. § 8–533(B)(8), ADES was required to make reasonably diligent efforts to make appropriate reunification services available to Father. However, the evidence shows that no one at ADES told Father the New Hope Ministries classes failed to satisfy the case plan, or that

---

16. Foster Parents also argue that Father could have moved for a continuance, but failed to do so. We reject this argument because it attempts to place the burden on Father to preserve his right to notice instead of where it properly belongs, on Foster Parents, the party attempting to justify a deviation from the presumptive notice rules. The amendment did not allow Father a fair opportunity to defend against the additional ground because he could have presented additional evidence had he known sooner the substance of the amendment. His failure to immediately respond to the addition of unexpected new charges by moving for a continuance does not mean that he consented to the additional ground or that the amendment was justified.

17. For example, at the conclusion of trial the court stated it "really has problems" with the time-in-care ground because "I'm not so sure that I would be able to find nor am I so sure that I would be required to find on the basis of what this motion is nor am I sure that an intervenor has the availability of ground (B)(8) for some of these allegations."

Father needed to re-take the classes in Arizona in order to comply with the case plan.[18] Accordingly, we conclude that the court erred in finding that ADES made diligent efforts to provide reunification services to Father.

### 3. Parent Unable to Remedy Circumstances of Placement

¶ 55 Pursuant to A.R.S § 8–533(B)(8)(c), the court found that Father was "unable to remedy the circumstances" that led to the Children's out-of-home placement. The termination petition cites Father's "refusal to participate in reunification services offered by the department [ADES]" in support of this allegation, while the dependency petition alleges Father was incapable of exercising proper and effective parental care over the Children because he was imprisoned in California.

¶ 56 The evidence does not support the trial court's findings on this element. With respect to the termination petition, to the extent the court found Father failed to complete the ADES case plan, we have determined the court erred in finding that ADES made diligent efforts to provide services to Father. *See supra* ¶ 54. As for the allegation in the dependency petition (that Father was incarcerated in California), by December 2010 Father had been released from prison in California and had returned to Arizona to be with his Children. As a result, by the time of trial, the State believed Father had remedied the circumstance that led to the dependency action.[19]

### 4. Substantial Likelihood of Parent's Incapacity to Exercise Proper and Effective Parental Care and Control in Near Future

¶ 57 Finally, the record does not support the trial court's finding that Father lacked the capacity to properly and effectively parent the Children in the near future.

¶ 58 The record shows that Father made numerous efforts to prove he was committed to caring for his Children. According to the CPS case worker, by the time of trial, Father had completed everything that CPS had asked him to do. Father obtained a job, housing, and consistently participated in visitation. Father worked hard at maintaining his sobriety; the CPS caseworker testified that at the time of trial, Father had tested clean for both drugs and alcohol for at least eleven months. Father made plans for elementary school, babysitters, and day care programs for his Children once they were returned to his custody.

¶ 59 Despite his limited income, Father made considerable efforts to provide for the needs of his Children. Father purchased toys and clothes for the Children, filling "a closet full of clothes." Father also purchased school shirts, tennis shoes, ballet shoes, and jazz shoes for the Children. Foster Mother testified that Father had asked her what the Children needed, and when she replied they needed T-shirts and tennis shoes, he purchased them.

¶ 60 The court appeared to acknowledge these efforts, stating that "[F]ather has made

18. Although A.R.S. § 8–533(B)(8) focuses on the efforts of ADES to provide services, we note that Father tried to comply with the reunification services that ADES provided. Father testified that while he had never received anything in writing from ADES indicating that he had successfully completed the requirements of his case plan, if someone from his ADES "team" had told Father that he needed to retake any of his required classes, he would have done so "immediately." In support of Father's testimony, the CPS caseworker testified that ADES accepted the New Hope Ministries certificate as proof Father completed his classes, and that ADES had never advised Father he needed to take any additional classes.

19. At trial, there was a brief discussion about what "unable to remedy the circumstances of

placement" meant in the context of an individual who had been incarcerated. The court asked the caseworker, "[i]n theory, once he was released from incarceration, then why did he have any case plan?" The case worker opined that ADES wanted to be able to "see that he is able to parent" and maintain sobriety because of his criminal and substance abuse history. She explained that these behaviors were what led to Father's incarceration, and were "inherent" in the incarceration ground alleged in the dependency petition. Since this discussion overlaps with the issue of Father's alleged incapacity "to exercise proper and effective parental control in the near future" discussed below, we address this issue in subsection 4, below.

significant progress, which does appear to have behavioral change." The court noted that "[Father] [was] employed[,]" "ha[d] resolved his legal problems[,]" and "appear[ed] to have a stable home." The court also pointed out that Father "[had] been clean and sober" for "greater than a year."

¶ 61 Dr. Harvancik, the psychologist who evaluated Father, testified that Father was "able to parent" and that his prognosis was "favorable that he can continue to adequately care for his children." The Foster Care Review Board Findings were also largely positive,[20] concluding that "[t]he Agency no longer intends to pursue the termination of biological father's parental rights" as of June 13, 2011.

¶ 62 In contrast, Foster Parents, who expressed a keen interest in adopting the Children, were generally critical of Father's parenting abilities. Foster Mother opined that Father was not capable of taking care of the Children based on his "lack of care" and interaction with the Children on his non-visitation days. However, Foster Mother also testified that if she were permitted to adopt the Children, as long as the GAL gave her approval, she would have no problem with allowing Father unsupervised visitation with the Children.

¶ 63 Foster Mother criticized Father for not attending medical appointments, school events, or parent-teacher conferences, but later acknowledged she had failed to tell Father about at least some of these events. Consistent with this testimony, Father testified that he did not know about many of these events because Foster Parents never told him about them. The CPS case worker corroborated Father's testimony by explaining the case notes documented at least four occasions when Foster Parents failed to notify Father about the Children's activities.

¶ 64 During the eleven-month period from his return from California in December 2010 to the date of trial, Father missed only one weekly visit with Children, when he needed to go to California to pick up his girlfriend. Father also admitted that during one of his visits with Children, when I.A. was being toilet-trained, he ran out of diapers and returned I.A. to Foster Mother diaperless but wearing underwear. Father explained the reason he did not buy more diapers on that particular visit was that he had run out of money and did not make it to the store. On the same visit, I.A. was running a fever and Foster Mother told Father to administer medicine to I.A. Father administered only one dose instead of the two doses Foster Mother recommended. Father explained, however, that the reason he only administered one dose was because he was worried about the impact of giving adult Tylenol to I.A., an infant.

¶ 65 Several issues were raised regarding Father's girlfriend, who lived in California. Foster Mother testified L.F. told her she felt weird when Father spoke to his girlfriend in Spanish because L.F. did not understand Spanish. However, the GAL also stated that it would be "wonderful" if Father was trying to teach L.F. another language.

¶ 66 Foster Parents asserted that Father took the Children to the fair with his girlfriend in violation of his case plan, which did not authorize the girlfriend to have contact with the Children during their visits with Father. Father stated that ADES told him the Children were allowed to interact with his girlfriend, but that she could not be left alone with them. Father explained that as a result of this admonition, he "didn't even go to the bathroom" while his girlfriend and the Children were in his home. The CPS caseworker later testified there was a handwritten note in the file documenting that Father was allowed to have the girlfriend present during visitation with the Children.[21] More-

---

20. The Board did also note that "the children have resided in foster care for approximately two years" and "biological mother and father have not displayed the necessary behavior changes to properly parent the children [as of the date of the report, June 2011]."

21. The note stated that Father was permitted "to have the girlfriend around the children, but the agency preferred that the interaction between the children and her was minimal and that we would prefer him to be the primary individual at the visit with the children" because ADES "didn't want to introduce another individual into the children's lives that would possibly not be there long term with the children." Foster Parents' counsel argued the court should not consider the

over, ADES had performed a background check on the girlfriend, and determined she was an "acceptable" person to be around the Children and did not pose any danger or threat to the Children.

¶ 67 Both the GAL and the CASA recommended that Father's parental rights be severed so the Children could be adopted by Foster Parents. However, based on the record, it appears that the opinions of the GAL and CASA failed to address the relevant issue before the court: whether there was a substantial likelihood Father was capable of exercising proper and effective parental control in the near future. Rather, their opinions were largely based on their belief the Children were more attached to Foster Parents, and that Foster Parents were "better" parents than Father. While the concern of the CASA and the GAL over maintaining the stability of the Children in their foster family is commendable, their opinions on these issues fell outside the scope of establishing the statutory basis for severing Father's parental rights.

¶ 68 For example, both the GAL and the CASA stated their opinions were based, in part, on their concern that given the length of time the Children had resided with Foster Parents, returning the Children to Father would upset the bonds the Children had developed with Foster Parents.[22] The CASA noted that he felt that I.A. had a stronger attachment to Foster Mother than Father. However, the CASA and GAL both testified that L.F. had expressed her desire to live with Father.

¶ 69 Significantly, neither the GAL nor the CASA testified that Father lacked the parenting skills or ability to properly parent the Children. Recognizing that "it's a difficult case with respect to dad," the GAL testified that she believed Father was "quite capable" and "intelligent[,]" but that she "[did not] know that he was willing" to socialize and educate his Children. She also testified that

she thought Father had a communication "deficit," because he did not speak to the Children telephonically on a daily basis, and because he spoke in Spanish to his girlfriend in front of L.F.[23] Moreover, while the GAL recommended that Father's parental rights be severed, she also recommended that Father be allowed to have "some kind of future and ongoing visitation" with the Children in the future.

¶ 70 The CASA admitted that he did not have any concerns with Father's parenting skills. However, the CASA stated he had concerns about Father's ability to "nurture," which he described as "putting an arm around them or something and maybe playing with [the Children] while the TV was going."

¶ 71 Finally, both the CASA and the GAL testified they had concerns about Father's financial resources. When asked whether he had any specific information about Father's finances, the CASA replied, "[n]ot really. Not that I can put my finger on, except what I've been told." The GAL's questions to Father suggested that she was concerned that if the girlfriend and her three children ended up living in Father's home, there would not be enough bedrooms for each child to have his or her own bedroom. However, neither of these concerns demonstrates that Father was incapable of exercising proper and effective parental care or that he would be unable to do so in the near future.

¶ 72 Accordingly, based on our review of the record, we conclude there was insufficient evidence to support the trial court's finding there was a substantial likelihood that Father was incapable of exercising proper and effective parental care in the near future.

### Conclusion

¶ 73 We conclude there was insufficient evidence to support the trial court's decision

---

caseworker's testimony about the note because the note had not been disclosed prior to her testimony.

**22.** Similarly, the Foster Care Review Board stated that while it was "pleased that biological father is compliant and making progress with his

case plan tasks, it remains concerned about [Children] transitioning into the father's care."

**23.** At the time the GAL testified, she conceded she had only "spoken with the father a couple of times," and only visited his home once.

to sever Father's parental rights and, therefore, vacate the judgment terminating Father's parental rights. Given that the judgment pertaining to Foster Parents' severance petition has been vacated, the private severance petition filed by Foster Parents and joined by the Children's Attorney is dismissed with respect to Father only.

CONCURRING: JOHN C. GEMMILL, Presiding Judge and PETER B. SWANN, Judge.