NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO A.C., E.C., and
K.C.

No. 1 CA-JV 23-0139

FILED 01-16-2025

---

Appeal from the Superior Court in Maricopa County
Nos. JD531290
JS520444
The Honorable Marvin L. Davis, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Office of the Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee*

---

**MEMORANDUM DECISION**

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in
which Vice Chief Judge Randall M. Howe and Judge Andrew M. Jacobs
joined.

---

**B A I L E Y**, Judge:

¶1          Oscar M. ("Father") appeals the superior court's order terminating his parental rights to A.C., E.C., and K.C. (collectively, "the children").[1] Because the children are eligible for membership in the Wichita Nation,[2] these proceedings are subject to the Indian Child Welfare Act ("ICWA"). For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          The Department of Child Safety ("DCS") filed a dependency petition based on neglect and drug abuse after police found A.C. and K.C. alone in Father's apartment. While at the apartment, police also found drug paraphernalia. DCS took custody of A.C., K.C., and Father's third child, E.C., in December 2021 and placed the children into foster care.

¶3          A few days after DCS removed the children, Father attended a preliminary protective hearing where the superior court appointed him counsel and scheduled hearing dates in February, March, and December 2022. At the hearing, DCS offered Father services, including substance abuse testing, transportation, and supervised visitation.

¶4          After the preliminary protective hearing, Father failed to contact DCS or attend any court hearings. DCS and several service providers tried to engage Father with reunification services but were unable to contact him. DCS eventually resorted to serving Father with hearing notices by publication. In September 2022, DCS moved to terminate Father's parental rights based on the statutory ground of abandonment. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 8-531(1), 8-533(B)(1).

¶5          Father appeared at a May 2023 hearing and provided DCS with his email address. Days later, and about thirty days before the scheduled termination trial, DCS initiated an email exchange and phone call with Father. By this time, Father had moved to Mexico and the case manager told him he would have to find drug testing and treatment services there because she was unfamiliar with services available outside

---

[1] The superior court also terminated the parental rights of the children's mother, who is not a party to this appeal.

[2] A.C. was born in 2013, E.C. in 2014, and K.C. in 2017. The children are affiliated with the Wichita Tribe. No evidence establishes that Father is Native American or a member of any tribe.

the United States. Father agreed and completed one drug test seven days before the termination trial. He did not ask about the children or request visitation during the phone call or email exchange.

¶6            The superior court held a contested termination trial in June 2023. At the trial, the superior court heard testimony from the DCS case manager, an ICWA tribal representative—a qualified expert witness under ICWA—and Father. Following the trial, the court terminated Father's parental rights to the children on the abandonment ground.

¶7            Following the superior court's termination order and Father's notice of appeal, DCS disclosed several documents that should have been disclosed before trial. The late-disclosed documents consisted of a substance abuse service provider report, three parenting skills service provider reports, a supervised visitation discharge report, and other service provider reports relating to the children's mother. Father moved to set aside the termination order, arguing the late disclosures violated his right to due process. The superior court held a hearing on the matter and denied Father's motion, finding none of the documents would have changed the termination trial's outcome.

¶8            We have jurisdiction pursuant to A.R.S. §§ 8-235(A) and 12-120.21(A)(1).

## DISCUSSION

¶9            Father argues the superior court's termination order should be vacated on several grounds: (1) the termination order violated ICWA; (2) DCS's untimely disclosure violated his due process rights and as a result, his motion to set aside was erroneously denied; and (3) no reasonable evidence supports the court's finding that termination was in the children's best interests.

I.       The superior court's termination order did not violate ICWA.

¶10           The superior court may terminate a parent's rights if it finds by clear and convincing evidence that at least one of the statutory grounds for termination exists and by a preponderance of the evidence that terminating the parent's rights is in the children's best interests. *See* A.R.S. §§ 8-533(B), 8-537(B); *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 227, ¶ 12 (2020). ICWA cases have two additional requirements: (1) DCS must prove that active efforts were "made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful," and (2) the court

must find beyond a reasonable doubt, from evidence that must include the testimony of a qualified expert witness, that continued parental custody "is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(d), (f); *accord Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334-35, ¶ 14 (2009); Ariz. R.P. Juv. Ct. 353(d).

**¶11**   "In reviewing a [termination] order, we accept the superior court's factual findings unless they are clearly erroneous, i.e., unless they are not supported by reasonable evidence." *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 422, ¶ 27 (App. 2011) (citation omitted). "We also view the evidence 'in the light most favorable to' upholding the court's judgment." *Id.* (citation omitted). And we do not reweigh the evidence of the diligence used in attempting to preserve the family. *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 81, ¶ 13 (App. 2005).

**¶12**   Father does not challenge the superior court's abandonment finding. Instead, he contends the superior court's termination order does not comply with the additional ICWA requirements. First, he alleges DCS did not make the requisite active efforts to prevent the breakup of his family. Second, he alleges no reasonable evidence supported the superior court's finding that the children would suffer serious physical or emotional harm if he maintained custody. Third, he alleges the children's foster care placements did not comply with ICWA's placement preferences.

    A.  DCS made active efforts to reunite father with the children.

**¶13**   Under ICWA, "[a]ctive efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. Examples of active efforts may include "[i]dentifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services." *Id.* at § 23.2(2). In the context of abandonment, "active efforts" include initiatives "aimed at promoting contact by a parent with the child and encouraging that parent to embrace his or her responsibility to support and supervise the child." *See S.S. v. Stephanie H.*, 241 Ariz. 419, 425, ¶ 22 (App. 2017) (citation omitted). But, active efforts "will vary, depending on the circumstances, the asserted grounds for [termination] and available resources." *Id.* at 425, ¶ 21 (citations omitted). Relevant considerations for assessing active efforts may include, for example, what services were needed, when DCS arranged for them, and the extent of the parent's participation. *See Yvonne L.*, 227 Ariz. at 423, ¶ 34. DCS is not responsible for a parent's refusal to participate in services or for delays and limited availability for services attributable to the parent's

4

actions. *See id.* at 423, ¶ 34 n.18 (noting that DCS's predecessor was not responsible for delay or interruption to services caused by parent's incarceration).

**¶14**        Father argues DCS did not make active efforts to contact him because it failed to ask him or his counsel for his email address. But, this argument ignores the multitude of other efforts DCS and the service providers made to contact him. The DCS case manager testified she tried to locate Father without success. She initiated two parent-locate searches, performed a Seneca search to locate relatives, and emailed Father as soon as he provided her his email address in May 2023. Additionally, Father was present at the December 2021 preliminary protective hearing where he was offered several reunification services and given future court dates to address the services. He could have informed DCS and the service providers about the best methods to contact him, but he chose not to do so and instead neglected to appear or provide updated contact information for more than a year. This evidence supports that DCS actively attempted to promote contact between Father and his children but could not do so because he could not be located.

**¶15**        Father also contends the DCS case manager's request that he self-refer for drug testing services was insufficient to satisfy the active-efforts requirement. Merely asking a parent to self-refer for services may not satisfy the active-efforts requirement. *Cf.* 25 C.F.R. § 23.2 ("Active efforts . . . may include, for example . . . [i]dentifying appropriate services and helping the parents to overcome barriers, *including actively assisting the parents in obtaining such services.*" (emphasis added)). But, active efforts vary depending on the circumstances and the extent of a parent's participation. *See Yvonne L.*, 227 Ariz. at 423, ¶ 34; *Stephanie H.*, 241 Ariz. at 425, ¶ 21.

**¶16**        Here, Father contacted DCS and began participating in the termination case only thirty days before the date scheduled for trial. Father was living in Mexico at the time. Because the DCS case manager was unfamiliar with the services available there, asking Father to find his own drug testing services was not unreasonable. And, Father did not object to locating a drug testing lab in Mexico and successfully scheduled and completed a drug test within days after his case manager's request.

**¶17**        In its termination order, the superior court explained the evidentiary bases for its conclusion that clear and convincing evidence supported finding that DCS made active efforts at reunification and the efforts failed. We conclude the evidence, given the surrounding circumstances, is sufficient to support the superior court's judgment.

B.     Reasonable evidence supports the superior court's finding that the children would suffer serious physical or emotional harm if Father's parental rights were not severed.

**¶18**         Father contends the superior court erred in finding that his continued parental custody would cause the children to suffer serious physical or emotional harm.  Specifically, he argues no expert testimony supported the court's finding that returning the children to him "would subject [them] to the serious emotional and physical damage that affects children whose parents use illicit drugs and are involved in criminal activity."

**¶19**         Before terminating a parent's parental rights to an Indian child, the superior court must find beyond a reasonable doubt that the parent's continued custody "is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).  Qualified expert testimony must support the finding, Ariz. R.P. Juv. Ct. 353(d)(1), and the subject matter of the expert testimony "must [] be forward looking—relating to the likelihood of future harm to the child." *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 571, ¶ 19 (2008) (citations omitted).  But, "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion." *Id.* at 571, ¶ 20 (citations omitted).

**¶20**         Our review of the record shows the representative for the Wichita and Affiliated tribes gave sufficient forward-looking testimony, that, along with other evidence, satisfied ICWA's requirements.  The representative testified that Father's continued custody of the children would result in serious emotional and physical damage to them "because of [Father's] lack of participation in the case."   In addition to the representative's testimony, the court also heard testimony that police found drug paraphernalia in Father's home and arrested him, and that Father had not seen or contacted his children for almost 18 months before the termination trial.

**¶21**         The superior court was free to conclude from this evidence that the children were likely to suffer serious emotional or physical damage if placed in Father's custody.  And, because the expert's testimony supported the superior court's future harm finding, we reject Father's argument that the court's termination order did not comply with ICWA.

C.     The children's respective foster care placements did not violate ICWA.

**¶22**     Father alleges no good cause existed to deviate from ICWA's placement preferences.  "We review a finding of good cause to deviate from ICWA preferences for an abuse of discretion."  *Navajo Nation v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 339, 343, ¶ 14 (App. 2012) (citation omitted).  We will not substitute our views for those of the superior court and will uphold the superior court's findings unless they are unsupported by the evidence.  *See Maricopa Cnty. Juv. Action No. A-25525*, 136 Ariz. 528, 533 (App. 1983).  And, "[w]e will affirm the [superior] court for any correct reason supported by the record."  *Navajo Nation*, 230 Ariz. at 344, ¶ 14 (citation omitted).

**¶23**     Absent good cause, adoptive placements must be made "in accordance with ICWA preferences for members of the child's extended family, then other members of the same tribe, and then other Indian families."  25 U.S.C. § 1915(a); *Navajo Nation*, 230 Ariz. at ¶ 16 (citations omitted).  Then, "the preferences are a foster home approved by the tribe, an Indian foster home approved by a non-Indian licensing authority, or an institution approved by an Indian tribe."  *Id.* (citing 25 U.S.C. § 1915(b)).

**¶24**     We look to Arizona Rule of Family Law Procedure 321 for guidance on how to interpret "good cause" because it is not defined by ICWA.  *Id.* at 345, ¶ 19 (citations omitted).  This rule provides that a determination of good cause not to follow the order of preference should be based on . . . "the unavailability of a suitable placement if the court determines that a diligent search was conducted to find suitable placements meeting the preference criteria, but none was located."  Ariz. R.P. Juv. Ct. 321(b)(3)(E).  The party seeking departure from the placement preferences has the burden of proving good cause exists.  Ariz. R.P. Juv. Ct. 321(b)(2).

**¶25**     Here, the children's foster care placements deviated from ICWA preferences.  But, the superior court found that good cause existed for this deviation because "no available family members were identified as possible placements for the children," "[n]either  [DCS]  nor the Wichita Tribe [] were able to locate ICWA/Tribal compliant placements for the children despite several searches," and the parents did not identify any family members willing to serve as placements for the children.

**¶26**     Father contends the superior court's good cause finding was error because the superior court "did not find that DCS and the tribe *diligently* searched for ICWA-compliant placements" and the evidence was contrary to such a finding.

**¶27**       The record supports the superior court's good cause finding. At trial, Father testified he proposed the paternal grandfather as a potential placement when DCS removed the children from his custody. But, DCS's case manager testified she tried to find and place the children with relatives, but none were available. She also testified that a Seneca search turned up no potential additional relatives and that Father provided no available family members. The tribal representative agreed there was good cause to deviate from the ICWA placement preferences because DCS's search for viable relatives turned up none and because the children's parents had offered no potential relatives as a placement. And while Father testified that the paternal grandfather would accept placement, the superior court apparently found his testimony less credible than the other witnesses and concluded that there was good cause to deviate from the ICWA Guidelines.

**¶28**       When viewing the evidence and the testimony of the Wichita tribal representative and case manager, the court could have reasonably concluded DCS diligently searched for compliant placements and was unsuccessful. We therefore reject Father's challenge to the termination order on this basis.

II.    The superior court did not err in denying Father's motion to set aside the termination order.

**¶29**       Father argues that his due process rights were violated because the late-disclosed documents supported his argument that "DCS had failed to make the ICWA-mandated active efforts to provide him with remedial services and rehabilitative programs." He contends that the untimely documents "presented questions that needed to be resolved through the litigation process," specifically whether the contact information DCS gave to the service providers was accurate.

**¶30**       "The Due Process Clause of the Fourteenth Amendment safeguards parents' fundamental liberty interest in their children's 'care, custody, and management.'" *Cruz v. Garcia*, 240 Ariz. 233, 236, ¶ 11 (App. 2016) (quoting *Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 238, ¶ 12 (App. 2012)). "Due process entitles a party to notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Cook v. Losnegard*, 228 Ariz. 202, 206, ¶ 18 (App. 2011) (quoting *Curtis v. Richardson*, 212 Ariz. 308, 312, ¶ 16 (App. 2006)). "Due process errors require reversal only if a party is thereby prejudiced." *Volke v. Brame*, 235 Ariz. 462, 470, ¶ 26 (App. 2014). Lack of notification and meaningful opportunity to be heard violates due process when dealing with fundamental parenting rights such as legal decision making. *Cruz*, 240 Ariz. at 236, ¶¶ 11-12. We

8

review constitutional claims de novo. *In re Estate of Snure*, 234 Ariz. 203, 204, ¶ 5 (App. 2014); *see Wassef v. Ariz. State Bd. of Dental Exam'rs*, 242 Ariz. 90, 93, ¶ 11 (App. 2017) (reviewing alleged due process violations de novo). But, we defer to the superior court's factual findings if they are supported by reasonable evidence. *See Roberto F. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 45, 52-53, ¶ 34 (App. 2013).

**¶31** Father argues the late-disclosed documents were evidence that DCS failed to make active efforts to reunify his family. But, he fails to explain how receiving the documents after the severance order prejudiced him. The documents detail multiple efforts by service providers to contact Father without success. For example, the Nurturing Parenting Program tried to call and email Father, attempted an at-home visit, and left a letter with Father's father, none of which was successful. The other documents detail similar outcomes from various service providers' attempts to contact Father. Each document supports the superior court's active-efforts finding. And, as we explained in section I(A), *supra*, reasonable evidence supports that finding. Because the documents do not support Father's argument that DCS failed to make active efforts, the late disclosure did not prejudice him.

**¶32** Father also argues the untimely disclosure prevented him from challenging the "particulars and accuracy" of the contact information DCS gave to the service providers. At trial, the DCS case manager testified she could not contact or locate Father for almost 18 months. Even without access to the late-disclosed documents, Father could have questioned the methods DCS used to find him and discovered what addresses or phone numbers it used to contact him. Instead, Father asked the DCS case manager only why she had never asked for his email address. Moreover, Father testified he did not have a phone, a driver's license, or a state-issued identification card and was homeless during much of the dependency. Father was obliged to keep his contact information up to date with DCS, as DCS advised him when they initiated the dependency.

**¶33** We cannot say Father was prejudiced by DCS's untimely disclosure or that the late disclosures prevented him from challenging the information's accuracy at trial. Accordingly, Father's right to due process was not violated.

III.    Reasonable evidence supports the superior court's best interests findings.

**¶34** When determining whether termination is in a child's best interests, "we can presume that the interests of the parent and child diverge

because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 12 (2018) (quoting *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, ¶ 35 (2005)).  After the court finds the parent unfit, the focus shifts to the child's interests separate from those of the parent, and the court's primary concern becomes the child's interest in stability and security.  *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 583, ¶ 27 (2021). Termination of a parent's rights "is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied."  *Alma S.*, 245 Ariz. at 150, ¶ 13.  Among the factors that the court may consider when making this determination "are whether: 1) an adoptive placement is immediately available; 2) the existing placement is meeting the needs of the child[ren]; and 3) the children are adoptable."  *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010) (citations omitted).

¶35        Father contends the superior court improperly found terminating his parental rights was in the children's best interests.  His assertion rests on his arguments that DCS did not make active efforts as required by ICWA and that no reasonable evidence established a risk of serious harm to the children.  But, as previously discussed in sections I(A) and (B), *supra*, DCS made active efforts to reunify Father and the children, and reasonable evidence established a serious risk of harm to the children. And Father has conceded the accuracy of the superior court's best interest findings because he did not contest them.  *See In re Z.L.*, 256 Ariz. 138, 143, ¶ 19 (App. 2023) (citing *Britz v. Kinsvater*, 87 Ariz. 385, 388 (1960)).  The superior court did not err in finding that terminating Father's parental rights was in the best interests of the children.

## CONCLUSION

¶36        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:          JR