SWANN, Judge:
¶ 1 Alma S. ("Mother") appeals from the severance of her parental rights to I.R. and J.R. We conclude that the record supporting the court's best-interests determination is insubstantial. We therefore vacate the severance order and remand for further proceedings.
FACTS AND PROCEDURAL HISTORY
¶ 2 I.R. is the biological child of Mother and Esdras R. ("Father"), and J.R. is Mother's biological child from a previous relationship.[2]
¶ 3 It is undisputed that Mother was away at work and I.R. was in Father's care on May 7, 2015. That day, Father sent Mother a Facebook message that I.R. had scratched his face while rolling around. That night, after Mother discovered the severity of I.R.'s injuries, Mother and Father argued because Father would not allow Mother to take I.R. to the hospital. Father then left the house for a few hours, but Mother failed to take I.R. to the hospital while he was away. The next morning, Mother asked her sister and cousin to take I.R. to the hospital while she was at work. Her sister asked Father if she could take I.R. to Chuck E. Cheese. Father agreed. Mother's sister and cousin then took I.R. to the hospital.
¶ 4 Hospital staff determined that I.R. had a healing rib fracture, a right-tibia fracture, a possible left-femur fracture (ultimately ruled out), and multiple bruises. The staff also observed bruises on J.R. They contacted the Department of Child Safety (the "Department") because they suspected abuse. Police found that though Father had a criminal history, there were no police or criminal records involving Mother.
¶ 5 The Department provided services to Mother and Father, and in early 2016 the parenting plan changed from reunification to severance and adoption. Mother complied with or successfully completed all services provided by the Department throughout this case, but in June 2016, Mother and Father were providing conflicting information about whether they were still dating. In July 2016-fourteen months after I.R.'s hospital admission-Mother completed a psychological evaluation, which diagnosed her with multiple drug dependency and personality disorders and concluded her prospects to successfully parent the children were "poor *929 at best" and would continue to be so for "a prolonged and indeterminate period of time." Ordinarily, we would afford great deference to the juvenile court's review of such an evaluation. But the record here reveals that the evaluation was untethered to the evidence.
¶ 6 In November 2016, the court held a two-day evidentiary hearing concerning severance of Mother's and Father's parental rights. Father did not appear and communicated through counsel that he did not contest the severance. The court severed Father's rights to I.R. and E.C. (a child from his previous relationship) in absentia and heard testimony on severing Mother's rights. Father's severance is not at issue in this appeal.
¶ 7 During her testimony, Mother asserted her Fifth Amendment right to remain silent in response to questions related to her failure to bring I.R. to the hospital immediately, awareness of I.R.'s injuries, and Father's history of domestic violence. From her silence, the juvenile court drew negative inferences that she was aware Father caused I.R.'s injuries but did not report them and that she was aware of Father's domestic-violence history. The Department introduced the psychological evaluation and had the evaluator testify. The juvenile court found clear and convincing evidence that Mother knew or reasonably should have known that Father abused I.R. and that she failed to protect I.R. See A.R.S. § 8-533(B)(2) ; Linda V. v. Ariz. Dep't of Econ. Sec. , 211 Ariz. 76, 79, ¶ 14, 117 P.3d 795, 798 (App. 2005) (holding that it is not necessary that the child be abused only that a child be abused). The court also found that severance was in the children's best interests and severed her rights. Mother appeals, challenging only the best-interests finding.
STANDARD OF REVIEW
¶ 8 We review severance orders for abuse of discretion, viewing the facts in the light most favorable to sustaining the juvenile court's findings. Xavier R. v. Joseph R. , 230 Ariz. 96, 99-100, ¶¶ 9, 11, 280 P.3d 640, 643-44 (App. 2012). "We will not disturb the juvenile court's order severing parental rights unless its factual findings are clearly erroneous, that is, unless there is no reasonable evidence to support them." Audra T. v. Ariz. Dep't of Econ. Sec. , 194 Ariz. 376, 377, ¶ 2, 982 P.2d 1290, 1291 (App. 1998). We review questions of law de novo and are not bound by findings that combine both facts and law. Wilmot v. Wilmot , 203 Ariz. 565, 568, ¶ 10, 58 P.3d 507 (2002).
¶ 9 We will not reweigh evidence, because the juvenile court is best positioned to "observe the parties, judge the credibility of witnesses, and resolve disputed facts." Jordan C. v. Ariz. Dep't of Econ. Sec. , 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009). But our review for "abuse of discretion" does not mean we look for culpable "abuse" by the court or imply that trial courts have an equal level of discretion in all situations. City of Phoenix v. Geyler , 144 Ariz. 323, 329, 697 P.2d 1073, 1079 (1985). "Abuse" of discretion occurs when a trial court's ruling is "clearly untenable, legally incorrect, or amount[s] to a denial of justice." Id. (citation omitted). When the court's decision is based on a faulty application of law or factual findings not logically supported by the evidence, we may afford a remedy on appeal under the abuse of discretion standard. Id.
THE EVIDENCE DOES NOT SUPPORT A BEST INTERESTS FINDING WITH REGARD TO MOTHER
¶ 10 The purpose of the state's initial involvement is not to sever parents' constitutionally protected rights to the care, custody, and association with their children, but to ensure that children are healthy and safe and to rectify the circumstances that led to the need for intervention. See Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ; A.R.S. §§ 8-451, -457; Mary Lou C. v. Ariz. Dep't of Econ. Sec. , 207 Ariz. 43, 49, ¶ 15, 83 P.3d 43, 49 (App. 2004) ; Mary Ellen C. v. Ariz. Dep't of Econ. Sec. , 193 Ariz. 185, 192, ¶¶ 32-34, 971 P.2d 1046, 1053 (App. 1999). "The combined effect of the fundamental character of a parent's right to his [or her] child and the severity and permanence of termination dictates that the court sever the parent-child relationship only in *930 the most extraordinary circumstances" and "only when concerted effort to preserve the relationship fails" or would be futile. Mary Ellen C. , 193 Ariz. at 192, ¶¶ 32, 34, 971 P.2d at 1053 (emphases added).
¶ 11 Parents must be given a fundamentally fair opportunity to rectify parenting problems before their parental rights may be terminated. See Mary Lou C. , 207 Ariz. at 49, ¶ 1 83 P.3d at 49 ; Mary Ellen C. , 193 Ariz. at 192, ¶¶ 32-34, 971 P.2d at 1053. Indeed, "[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.' " Goldberg v. Kelly , 397 U.S. 254, 262-63, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (citation omitted). As the United States Supreme Court held in Santosky v. Kramer :
The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.
455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (emphasis added).
¶ 12 If reunification is not possible, the state must show by clear and convincing evidence that a severance ground exists under A.R.S. § 8-533(B), and by preponderance of the evidence that severance is in the child's best interests. Kent K. v. Bobby M. , 210 Ariz. 279, 280, 288, ¶¶ 1, 41, 110 P.3d 1013, 1014, 1022 (2005). Here, the statutory ground exists-Mother failed for a brief time to protect her child from Father's abuse. But Mother was not the abuser, and Father's rights have been terminated. We therefore turn to the best-interests determination.
¶ 13 "Best interests" is a technical term that does not always carry its broad colloquial meaning. The best-interests determination does not invite a freewheeling inquiry by the government into what placement would be "best" for the child in the abstract. It is unconstitutional "to force the breakup of a natural family ... without some showing of unfitness and for the sole reason that to do so was thought to be in the child[ ]'s best interest." Quilloin v. Walcott , 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). "In any severance proceeding, the material issue facing the court is whether a parent has the ability to properly parent his/her child...." Roberto F. v. Ariz. Dep't of Econ. Sec. , 232 Ariz. 45, 54, ¶ 42, 301 P.3d 211, 220 (App. 2013). Indeed, "[t]he State's interest in finding the child an alternative permanent home arises only 'when it is clear that the natural parent cannot or will not provide a normal family home for the child.' " Santosky , 455 U.S. at 767, 102 S.Ct. 1388 (citation omitted). "So long as certain minimum requirements of child care are met, the interests of the child may be subordinated to the interests of other children, or indeed even to the interests of the parents or guardians themselves." Reno v. Flores , 507 U.S. 292, 304, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).
¶ 14 While the severance-ground inquiry focuses on the parent, the best-interests inquiry primarily focuses on the child. See Demetrius L. v. Joshlynn F. , 239 Ariz. 1, 4, ¶ 15, 365 P.3d 353, 356 (2016) ; Kent K. , 210 Ariz. at 287, ¶ 38, 110 P.3d at 1021. Best interests is a fact-specific, case-by-case determination in which the court balances a parent's interest in maintaining a relationship with his or her child (diluted by the existence of a severance ground) against the child's interest in a safe and stable home life. Demetrius L. , 239 Ariz. at 4, ¶ 15, 365 P.3d at 356 ; Kent K. , 210 Ariz. at 286, ¶ 35, 110 P.3d at 1020. Though severance grounds usually have a negative impact on the child, the existence of a ground is not itself a basis for an adverse best-interests finding-something more is required. See In re Maricopa Cty. Juvenile Action No. JS-500274 , 167 Ariz. 1, 5, 804 P.2d 730, 734 (1990). A severance must affirmatively benefit the child or eliminate a *931 detriment of the parental relationship. Dominique M. v. Dep't of Child Safety , 240 Ariz. 96, 98, ¶ 8, 376 P.3d 699, 701 (App. 2016).
¶ 15 Against this legal background, we examine the record in this case.
DISCUSSION
I. THERE IS NO EVIDENCE THAT PRESERVATION OF MOTHER'S RIGHTS WOULD POSE A THREAT TO THE CHILDREN.
¶ 16 Though the Department does not argue that severance would prevent detriment to the children, the juvenile court found that if Mother's rights were severed, the children would each live
in a home where they will be free from any risk of physical abuse. They will each have parents who are committed to protecting them from harm and who provide loving and nurturing homes. While Mother loves her [children], she chose to continue her own unhealthy, abusive relationship with [Father] rather than ending the relationship to protect herself and her children. The Court cannot find on the evidence presented that Mother won't make similar decisions in the future.
(Emphasis added.) In finding grounds for severance based on abuse, the court stated:
Only recently has Mother said that she is no longer with Father. However, Father has said otherwise to his therapist.[3 ] Even if the Court accepts that Mother is being honest and she is no longer in a relationship with Father, it is literally too little too late to demonstrate that she is willing to protect her children from an abusive person.
¶ 17 We agree that if Mother were to expose the children to Father, the children's best interests would be jeopardized. Such a fact would weigh heavily in favor of severance. But the court did not find that Mother and Father were still in a relationship, nor did it find that the children would be subject to abuse by him (or anyone else) if they were in Mother's care.
¶ 18 Only two pieces of evidence could support the juvenile court's findings: the testimony of the Department's case manager and the psychologist's testimony and evaluation of Mother. Both are too fundamentally flawed to support severance.
¶ 19 In the summer of 2016, a new case manager was assigned. The new case manager testified at the severance hearing that she mistrusts Mother's judgment and ability to protect the children from future abuse. But opinion testimony can only provide the basis for a court's decision if it is based on fact. Cf. Adams v. Amore , 182 Ariz. 253, 254, 895 P.2d 1016, 1017 (App. 1994) (holding that an expert's opinion was inadmissible when a party "failed to lay the foundation that [the expert] based his opinions on facts or data 'of a type reasonably relied upon by experts in [his] particular field,' " as set forth in Ariz. R. Evid. 703 ).
¶ 20 The case manager testified that in reaching her conclusion she read several but not all of the parent-aide notes (which total 145 pages), never met with Mother outside of court hearings, only consulted with one of the service providers who worked with Mother, never attempted to confirm her suspicions that Mother and Father were still dating, never observed Mother with the children, and never visited or attempted to visit Mother's home to see if it would be safe for the children. Such a casual inquiry into the facts is not sufficient to meet even minimal professional standards, and such testimony is not sufficient to defeat fundamental constitutional rights.
¶ 21 The psychologist's conclusions are equally unfounded. Shortly after the new case manager was assigned, the Department referred Mother for a psychological evaluation.
*932 [4] The only background information the Department provided the psychologist was a copy of the initial child safety plan and risk assessment saying that drugs and spoiled food were found in the house Mother and Father shared at the start of the case, and a version of the January 2016 progress report to the juvenile court, which included a recitation of the investigation after I.R.'s admission to the hospital, including a description of I.R.'s injuries and a notation about the initial challenges in finding Mother a domestic-violence counseling group.[5]
¶ 22 From this information, an interview with Mother, and several personality tests, the psychologist prognosticated that Mother's ability "to demonstrate minimally adequate parenting skills [will be] poor at best" for "a prolonged, indeterminate period of time." The psychologist diagnosed Mother with (1) unspecified mood disorder;[6] (2) personality disorder, unspecified (dependent traits) (principal); (3) cannabis use disorder, moderate, in sustained remission (per client's report); (4) cocaine use disorder, moderate, in sustained remission (per client's report); and (5) hallucinogen (ecstasy) use disorder, mild, in sustained remission (per client's report).[7] The psychologist recommended Mother receive one year of doctoral-level therapy,[8] family therapy, and group therapy; and further recommended specialized substance-abuse treatment, parenting classes, parent-aide services, and domestic-violence classes.
¶ 23 If these conclusions were supported by evidence, they would indeed be significant, but the evidence tells a different story. Conspicuously absent from the information the Department gave the psychologist is any reference to the 14 months of services Mother had successfully completed or was currently receiving. Mother had-without exception-tested negative for drug use;[9] successfully closed out of her drug-testing service because of the lack of any positive test; closed out of drug rehabilitation because the service provider determined that no drug treatment was necessary; participated in domestic-violence counseling and group meetings; and successfully completed at least eight months of parent-aide services and supervised visitation, where she always came prepared and showed proper parenting skills.
¶ 24 At trial, the expert testified that he never received any information about these services. Nevertheless, he testified that Mother had benefitted "very little" from them and that the lack of a positive drug test did not detract from his conclusions on her drug dependence and need for treatment. He explained, "I was not looking ... [at] her training and as to being a parent, I was looking for a diagnosis." Because he neither considered the available information nor attempted to evaluate Mother's parenting skills, his conclusion that she is unable to successfully parent for the foreseeable future is not reasonable evidence of Mother's parenting ability. Indeed, the foundation for his opinion is so lacking that we question (though we do not here decide) its admissibility.
*933 See Ariz. R. Evid. 702 (expert witness's opinion testimony must be "based on sufficient facts or data" and reliable principles and methods "reliably applied ... to the facts of the case " (emphasis added)). Even assuming the psychologist's evaluation and testimony were admissible as an expert opinion that a parent with these diagnoses would generally not be able to successfully parent a child, it cannot be inferred from this record that Mother is an unfit parent. See Santosky , 455 U.S. at 767, 102 S.Ct. 1388 ; Roberto F. , 232 Ariz. at 54, ¶ 42, 301 P.3d at 220.
¶ 25 The psychologist's conclusions about the risks to the children from domestic abuse are equally unsubstantiated. The evaluation stated that Mother:
has shown a pattern of being in destructive relationships where she is physically and emotionally abused and she has been unable to leave the situation. Maintaining a relationship, even when destructive, becomes more important than the safety of [her] children. It is noteworthy to mention that [Mother] also has built a pattern of choosing men with significant deficits, which include antisocial behaviors and severe substance use.
The evaluation concludes that Mother failed to protect her children from abuse once and "without appropriate intervention, she may likely behave in this manner again."
¶ 26 These are persuasive words, but the minimal evidence of this pattern of Mother choosing abusive partners does not support an inference that Mother will fail to protect the children in the future. According to the psychologist's notes, J.R.'s father is currently in prison, and during his relationship with Mother he used drugs. Mother "adamantly denied" to the psychologist that he was abusive to her. A notation in the hospital notes from I.R.'s hospitalization states that there was "a history of domestic violence" between J.R.'s father and Mother. Such a notation, without any elaboration, explanation, attribution, or substantiation of any kind is insufficient to show that Mother habitually selects emotionally or physically abusive romantic partners who would pose a danger to the children. All evidence in the record shows that her relationship with J.R.'s father ended before J.R.'s birth. There were instances of domestic violence by Father against Mother, but the most recent incident of physical abuse was in 2014. And again, Father's rights have been severed.
¶ 27 Unless the Department can show that Mother is unable to protect the children from future abuse, severance cannot stand on a record that shows only that she was the victim of domestic violence at the hands of the person who abused the children-a person who is no longer present in the children's lives. To hold otherwise would be to punish the victim for the behavior of the abuser. It is true that Mother failed to take I.R. to the hospital immediately when she discovered his injuries, but her resort to artifice so that her relatives could take him the next day hardly reveals complicity in the abuse. It cannot be inferred from such a record that Mother chooses abusive partners and will be unable to protect the children from a future abuser.
¶ 28 To bolster the evidence of a pattern, the Department suggested two events of psychological abuse and emphasized a specific parent-aide note. But descriptions of the domestic-violence incidents were mostly provided by the Department's attorney, and few details were adopted by any witness or confirmed by other evidence. The first was when Mother called the police to their home, about a week before I.R. was taken to the hospital, because Father had taken her keys. The second was in August 2015 when Father took Mother's phone and broke it. The parent-aide note from February 2, 2016, upon which the Department relied, states in relevant part:
[Mother and Father] welcomed me into their home. [Father] seemed a little on edge. [Mother] was a little bit more quiet at this parent meeting. I did notice that [Mother] did not talk as much and was looking down on the floor when [Father] was talking. I asked [Father] how he felt the last few visits went at the DCS office with him. His answer was "Fine. Good. What is it suppose it be?" [Father] was getting upset and started telling me that he did not know he was doing a bad job. I told [Father that he] was not doing a bad job and that he was taking what I was saying wrong. I explained that I was just *934 trying to see how he was feeling with the visits and if he was feeling a little disconnected to [I.R.] [Father] told me that he can not be that "kind" of dad. I asked him what he meant, he said he would not play paddy cake or sing to him. [Mother] interrupted and told [Father] that she had noticed he was being a little rough with [I.R.], and that he needs to be gentle with [I.R.] that [I.R.] is just a baby, [and] not older like [J.R.]. [Father] became upset and left the meeting. [Mother] told me that she had noticed [Father] become different in the past few visits. [Father] came back into the apartment and told me he was sorry for leaving but is upset with how much is on his plate with DCS.
(Emphasis added.)
¶ 29 This entry (one of dozens made over the course of eight months) is not proof of Mother's inability to protect the children. To the contrary, it shows that Mother was concerned with Father's treatment of I.R. and confronted him about it. Nor is there a single notation in 145 pages of parent-aide notes to suggest a pattern of selection of abusive partners by Mother, or abuse by Mother. According to the parent-aide provider's records, there was not a single instance of Mother failing to come prepared for a visit nor a single situation involving Mother that required the assistance of the parent aide. Every entry notes the love and affection Mother showed for the children. Parent-aide services ended three weeks after the February 2, 2016 parent meeting because the Department transferred the case to another parent-aide provider. But there is no reference to another service provider anywhere else in the record. It appears the Department never made a referral to a new provider nor attempted to continue the parent-aide service, despite the provider's repeated recommendations that the service continue.
¶ 30 The problems with the psychologist's evaluation are exemplified by its conclusions about Mother's drug use, which are not only contrary to the evidence in the record but also to the information in the psychologist's possession when he evaluated Mother. Mother never tested positive for drugs, and the service provider concluded that she needed no services to address drug abuse. Yet the psychologist opined that Mother was at a high risk of relapse and was only sober because "she sees herself in trouble." The evaluation said that Mother was evasive regarding using substances, indicated that her self-reporting was the only evidence of sobriety, and concluded that "[Mother] has shown significant lack of insight into how her psychological issues and substance use affect her functioning and how this places her children at risk." The evaluation stated that her behavior was consistent with the pre-contemplation stage of change, that she did not intend to rectify the situation in the foreseeable future, and that this category of person would choose to purchase drugs rather than food for her children and is more likely to act physically towards them.
¶ 31 According to the psychologist's own notes, Mother experimented with a variety of drugs before turning 21 and regularly used marijuana thereafter, but she ceased all drug use when J.R. was born (when she was 25) and had not used drugs for at least three years. The Department failed to inform the psychologist of Mother's negative drug tests and the treatment provider's determination that she did not need drug treatment-even the evidence he had did not support his conclusions about drug use.
¶ 32 Even if we were to accept the evaluation's diagnoses and make the dubious assumption that they would have been the same had the psychologist had all the available information, there must still be some reasonable evidence that diagnosed psychological traits will manifest themselves to the detriment of the children-their mere existence is not enough. Cf. In re Maricopa Cty. Juvenile Action No. JS-6831 , 155 Ariz. 556, 559, 748 P.2d 785, 788 (App. 1988) (holding that despite abandonment there would be no benefit from a severance or harm from the continuation of the parent's rights when there was a potential for a deeper relationship with the parent).
¶ 33 Based on this record, we hold that the psychologist's testimony, the evaluation's conclusions, and the case manager's testimony are not sufficiently rooted in the evidence to support the juvenile court's best-interests *935 finding. And apart from these unsupported, conclusory opinions, the only evidence that severance is in the children's best interests is the fact that the children are adoptable.
II. THE EVIDENCE SHOWS THAT MOTHER IS ABLE TO PARENT THE CHILDREN SAFELY AND SUCCESSFULLY.
¶ 34 In evaluating the children's best interests, the court found that both children were adoptable, that their respective placements are meeting their needs, and that they would gain permanency and stability through severance. The Department argues this is sufficient to establish best interests. We disagree.
¶ 35 Adoptability is a commonly proven benefit of severance, but it is not on its own sufficient to overcome a parent's constitutional rights. Lawrence R. v. Ariz. Dep't of Econ. Sec. , 217 Ariz. 585, 588, ¶ 11, 177 P.3d 327, 330 (App. 2008) (holding that adoptability does not equate to best interests); see also In re Maricopa Cty. Juvenile Action No. JS-500274 , 167 Ariz. 1, 7-8, 804 P.2d 730, 736-37 (1990) (holding that the fact a child has been abandoned and would be adoptable by the mother's hypothetical future husband and that the mother could nominate her parents as potential guardians if something should happen to her was not enough to show that severance was in the child's best interests); cf. Jose M. v. Eleanor J. , 234 Ariz. 13, 17-18, ¶¶ 19, 23, 316 P.3d 602, 606-607 (App. 2014) (vacating a severance for failure to prove abandonment but explaining that the child's day-to-day life would have to be affected to find that severance is in the child's best interests), overruled in part on other grounds by Demetrius L. , 239 Ariz. at 5, ¶ 18, 365 P.3d at 357.
¶ 36 The Department must show that there is a substantial likelihood that the parent will not be capable of parenting effectively in the near future, not that someone with better parenting skills may be able to care for the child. See Roberto F. , 232 Ariz. at 53, ¶ 38 n.11, 301 P.3d at 219 n.11. Otherwise, "it is irrelevant whether a child has a stronger attachment to their foster parents, whether foster parents are more 'nurturing,' or whether foster parents might be more capable or better parents than a natural parent." Id. at 54, ¶ 42, 301 P.3d at 220.
¶ 37 Mother required little or no counseling on how to improve her parenting skills and there is a bond between her and the children. At the close of the evidentiary portion of the hearing, the Department conceded Mother's successful compliance with services and the fact that Mother is bonded with the children. There also is evidence of a bond between I.R. and J.R. But no placement could take both children, so severance of Mother's rights permanently separates the siblings. Mother is employed and is living with her sister and niece in an apartment that would be safe for the children.
¶ 38 If a parent's ability to parent the children has been established by parent-aide services, there is a bond between the children and parent, and the parent has attained a safe and stable living situation, then the children's adoptability, household stability, and the ability of their current placements to meet their needs are subordinate to the fundamental rights of the parent in determining best interests, unless severance removes a detriment caused by the parental relationship. But neither Mother nor her current living situation pose any danger to the children. And the speculative finding that she might someday involve herself in a relationship with someone who would abuse the children is not an adequate basis to conclude that severance is now in the children's best interests.[10]
¶ 39 A parent's rights should be preserved "when the parent grasps the opportunity [to reunify with a child] quickly, diligently, and persistently" and without failure. In re Pima Cty. Juvenile Severance Action No. S-114487 , 179 Ariz. 86, 101, 876 P.2d 1121, 1136 (1994). Mother did so here. If exemplary *936 compliance with services and a strong parental bond are insufficient to avoid an adverse best-interests finding, then the services themselves serve no purpose except to delay an inevitable severance. Because Mother has a fundamental constitutional right to the "companionship, care, custody, and management of" and "associat[ion] with" her children, we cannot affirm a severance on such a thin record, even under our deferential standard of review. See Stanley , 405 U.S. at 651, 92 S.Ct. 1208 ; In re Maricopa Cty. Juvenile Action No. JD-5312 , 178 Ariz. 372, 374, 873 P.2d 710, 712 (App. 1994).
CONCLUSION
¶ 40 For the foregoing reasons, we vacate the severance of Mother's parental rights and remand for further proceedings.

J.R.'s biological father is not a party to this appeal. His rights to J.R. were severed in May 2016.

The Department argued that Mother and Father were still involved based on a statement Father made during his psychological evaluation on June 9, 2016, but the Department conceded that Father was "not the most reliable person." Mother testified that they broke up before July 2016 and that she is not in any direct or indirect contact with Father, and she explained in her psychological evaluation in August 2016 that she had given him many chances but was now "done with him." The Department made no effort to determine whether Mother and Father were in a relationship though the case manager testified it was "possible" they were.

There was evidence that Mother delayed her participation in the evaluation. The evaluation names the former case manager as the referrer, but this referral was made about a month after the new case manager was assigned.

However, the portions of the January 4, 2016, progress report reproduced in the evaluation omit any reference to the drug testing, rehabilitation, and parent-aide services provided to Mother-information that was in the copy of the progress report given to the court. The January progress report also makes no mention of Mother's attainment of stable employment and housing, but the Department's July progress report to the juvenile court-submitted two weeks before the referral for the evaluation-did include that information.

The evaluator also stated that "records" indicated Mother has bipolar disorder. But there is no reference to any such records anywhere else in the evaluation (or the record on appeal). And the only records the evaluator claims he consulted were the progress reports provided by the Department. There is no other indication in the record that Mother is bipolar.

The Department did not seek to sever Mother's rights on drug-addiction grounds. See A.R.S. § 8-533(B)(3).

The Department referred Mother for doctoral-level therapy, which commenced a few weeks before trial, and Mother consistently participated.

In contrast Father tested positive on numerous occasions throughout the case.

We recognize that a clear history of relationships with partners who engage in child abuse or in domestic violence that endangers the children might serve as a basis for finding that a parent is unable to protect the children from future abuse. But this case presents insufficient evidence of such a pattern.