IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

ALMA S.,
*Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, J.R., I.R.,
*Appellees.*

No. CV-17-0363-PR
Filed September 14, 2018

Appeal from the Superior Court in Maricopa County
The Honorable Cari A. Harrison, Judge
Nos. JS18287
JD30481
**AFFIRMED**

Opinion of the Court of Appeals, Division One
244 Ariz. 152 (App. 2017)
**VACATED**

COUNSEL:

H. Clark Jones (argued), Law Office of H. Clark Jones, LLC, Mesa, Attorney
for Alma S.

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor
General, Nicholas Chapman-Hushek (argued), Toni M. Valadez, Assistant
Attorneys General, Mesa, Attorneys for Department of Child Safety

JUSTICE LOPEZ authored the opinion of the Court, in which CHIEF
JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES
PELANDER, TIMMER, and GOULD joined. JUSTICE BOLICK concurred
in the result.

JUSTICE LOPEZ, opinion of the Court:

¶1        This case concerns the inquiry juvenile courts must make to determine whether parental severance is in the "best interests of the child" for purposes of A.R.S. § 8-533(B).  We hold that courts must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation.

## I.        BACKGROUND

¶2        Alma S. ("Mother") was involved in a relationship with Esdras R. ("Father").  I.R. is the biological child of Mother and Father, and J.R. is Mother's biological child but not Father's.  J.R.'s father abused Mother during their previous relationship.  Father also routinely abused Mother and both children.  Father, in May 2015, severely beat two-month-old I.R. while Mother was at work.  When Mother returned, she failed to take I.R. to the hospital even though Father was absent for several hours.  Without Father's knowledge, I.R. was finally taken to the hospital the next day by Mother's sister and cousin.  Hospital staff determined that I.R. had a healing rib fracture, a right tibia fracture, a possible left femur fracture (ultimately ruled out), and multiple bruises.  The staff also observed bruises on two-year-old J.R.

¶3        The Department of Child Safety ("DCS") subsequently removed both children from Mother's home, and the children were determined to be dependent.  Over the next eighteen months, DCS provided Mother and Father with an array of services, including a parent aide, drug testing, and a psychological evaluation.  Mother's drug testing was discontinued after she passed consecutive tests.  However, the psychologist who conducted Mother's evaluation diagnosed her with mood and personality disorders, and multiple substance abuse disorders in self-reported remission.  He noted Mother's "poor judgment" in choosing abusive romantic partners and entrusting her children to someone "significantly unfit" to care for them.  He concluded that Mother was unable to protect herself or the children from abuse, that she lacked insight into the dangers posed by abusive partners, that "[m]aintaining a relationship, even when destructive, becomes more important than the safety of [her] children," and that her future parenting prospects were "poor at best."  Mother's DCS case manager agreed, concluding that Mother was unable to protect the children.

¶4 In December 2015, DCS moved to terminate Mother's parental rights to both children on the ground that she was unable to protect them from abuse. *See* § 8-533(B)(2). Following a two-day evidentiary hearing in November 2016, the juvenile court severed Mother's parental rights. It inferred that Mother was aware that Father caused I.R.'s injuries and did not report them or seek medical care. It also noted that although Mother claimed to have ended her relationship with Father, he had stated otherwise to his therapist. The court then determined that severance was in the best interests of the children because their current out-of-home placements were meeting their needs, the children were in an adoptive placement, and both children would be "considered adoptable if the current placement was not able to complete the adoption for any reason." Mother appealed, challenging only the juvenile court's best-interests finding.

¶5 The court of appeals vacated the juvenile court's order, holding that "the record supporting the court's best-interests determination is insubstantial." *Alma S. v. Dep't of Child Safety*, 244 Ariz. 152, 155 ¶ 1 (App. 2017). To terminate Mother's parental rights, the court reasoned, DCS "must show that there is a substantial likelihood that the parent will not be capable of parenting effectively in the near future, not that someone with better parenting skills may be able to care for the child." *Id.* at 162 ¶ 36 (citing *Roberto F. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 45, 53 ¶ 38 n.11 (App. 2013)). According to the court of appeals, when parent-aide services demonstrate "a parent's ability to parent the children," the parent and children have a bond, and the parent's living situation is "safe and stable," "the children's adoptability, household stability, and the ability of their current placements to meet their needs are subordinate to the fundamental rights of the parent in determining best interests, unless severance removes a detriment caused by the parental relationship." *Id.* ¶ 38. Throughout its opinion, the court stressed the importance of a parent's constitutional right to raise her children. *See, e.g., id.* at 157 ¶ 11, 158 ¶ 20, 163 ¶ 39.

¶6 The court of appeals conducted a detailed analysis of the evidence presented to the juvenile court. In reaching its holding, the court rejected the juvenile court's finding that Mother and Father were still in a relationship, *id.* at 158 ¶¶ 16–17, 160 ¶ 27, and disagreed with the DCS case manager and the psychologist's conclusion that Mother lacked the ability to protect the children from abuse, *id.* at 158 ¶¶ 19–20, 160 ¶¶ 25–27.

Despite the court's acknowledgement that the only issue on appeal was the juvenile court's best-interests determination, *id.* at 156 ¶ 7, it found that "it cannot be inferred from this record that Mother is an *unfit* parent," *id.* at 160 ¶ 24 (emphasis added).

**¶7**    We granted review to clarify the appropriate inquiry for a best-interests analysis under § 8-533(B) — an issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.  THE TWO-STEP SEVERANCE INQUIRY

**¶8**    Section 8-533(B) sets forth the grounds that "justify the termination of the parent-child relationship," and states that "the court shall also consider the best interests of the child" in deciding whether to terminate parental rights. We have interpreted § 8-533(B) as entailing a two-step inquiry. *See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 ¶ 15 (2016). First, the juvenile court must find by clear and convincing evidence that a statutory ground for termination exists. *Kent K. v. Bobby M.*, 210 Ariz. 279, 286 ¶ 35 (2005); *see also* A.R.S. § 8-537(B) ("The court's findings with respect to grounds for termination shall be based upon clear and convincing evidence . . . ."). Second, the court must determine by a preponderance of the evidence that severance is in the child's best interests. *Kent K.*, 210 Ariz. at 284 ¶ 22, 285–86 ¶ 31.

**¶9**    In *Kent K.*, we implicitly equated the substantive grounds for termination listed in § 8-533(B) with parental unfitness. *Id.* at 285–86 ¶¶ 31–32. We now explicitly reiterate that conclusion, which ensures compliance with the due process requirement that a court find, by clear and convincing evidence, parental unfitness when a severance is contested. *See Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *Kent K.*, 210 Ariz. at 285 ¶ 28. If a statutory ground were not synonymous with unfitness, a contested severance based on such ground would be constitutionally infirm.

**¶10**   Eight of the eleven statutory grounds in § 8-533(B) are proxies for parental unfitness because they demonstrate a parent's inability "to properly parent his/her child." *See Roberto F.* at 54 ¶ 42. They address the most serious instances of parental abuse, neglect, or incapacity. *See* § 8-533(B)(1) (abandonment of the child); § 8-533(B)(2) (neglect or willful abuse of the child); § 8-533(B)(3) (parent not capable of "discharg[ing]

parental responsibilities" due to mental illness or chronic substance abuse); § 8-533(B)(4) (parent convicted of a felony that is demonstrative of unfitness); § 8-533(B)(8) (failure of a parent to "remedy the circumstances that cause [a] child to be in an out-of-home placement"); § 8-533(B)(9) (identity and location of parent is unknown despite three months of "diligent efforts" to find parent); § 8-533(B)(10) (parental rights to another child terminated within the preceding two years and the parent is "currently unable to discharge parental responsibilities due to the same cause"); § 8-533(B)(11) (failure of a parent to discharge parental responsibilities after child removed for second time within 18 months to out-of-home placement).

¶11        Section 8-533(B) also lists three other grounds for termination that are facially procedural and thus potentially not indicative of unfitness. These grounds address situations in which a parent has voluntarily relinquished her parental rights or waived her right to contest severance, and hence a finding of parental unfitness is not required. *See* § 8-533(B)(5) (a "potential father fail[s] to file a paternity action" after receiving notice under A.R.S. § 8-106(G)); § 8-533(B)(6) (a "putative father fail[s] to file a notice of claim of paternity as prescribed in § 8-106.01"); § 8-533(B)(7) ("[T]he parents have relinquished their rights to a child to an agency or have consented to the adoption."). Thus, all eleven statutory grounds in § 8-533(B) either constitute a finding of parental unfitness or operate only when a parent fails to properly contest the severance.

## III.  THE BEST-INTERESTS INQUIRY

¶12        At the best-interests stage of the analysis, "we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Kent K.*, 210 Ariz. at 286 ¶ 35. Therefore, once the court finds "that a parent is unfit, the focus shifts to the interests of the child as distinct from those of the parent." *Id.* at 285 ¶ 31; *see also Demetrius L.*, 239 Ariz. at 4 ¶ 15. The "child's interest in stability and security" must be the court's primary concern. *Demetrius L.*, 239 Ariz. at 4 ¶ 15 (quoting *Kent K.*, 210 Ariz. at 286 ¶ 34).

¶13        To this end, we have held that termination is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied. *Id.* ¶ 16. "It is well established

in state-initiated cases that the child's prospective adoption is a benefit that can support a best-interests finding," *id.*, but that does not mean that courts are free to disregard other evidence regarding a child's best interests, *see Lawrence R. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 585, 588 ¶ 11 (App. 2008) ("While a [factfinder] *may* find that severance is in a child's best interests if the child is found to be adoptable, the [factfinder] is not required to do so."). Courts must consider the totality of the circumstances existing at the time of the severance determination. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98–99 ¶¶ 11–12 (App. 2016) (noting that courts may consider the negative effect on a child of the continued presence of a statutory severance ground in a totality of the circumstances best-interests inquiry).

**¶14**      Here, the court of appeals erred by relying on *Lawrence R.* to support the proposition that adoptability alone can never support a best-interests finding "sufficient to overcome a parent's constitutional rights." *Alma S.*, 244 Ariz. at 162 ¶ 35. *Lawrence R.* does not reach that conclusion but merely notes that, under a prior statutory scheme, a jury may find that severance is in a child's best interests if the child is adoptable. *Lawrence R.*, 217 Ariz. at 588 ¶ 11. Further, *Lawrence R.* comports with binding precedent from this Court. In *Demetrius L.*, we concluded that "[w]hen a current placement meets the child's needs and the child's prospective adoption is otherwise legally possible and likely, a juvenile court may find that termination of parental rights, so as to permit adoption, is in the child's best interests." 239 Ariz. at 4 ¶ 12.

**¶15**      We recognize that although the focus of the best-interests inquiry is on the child, courts should consider a parent's rehabilitation efforts as part of the best-interests analysis. But what courts must not do, and what the court of appeals did here, *see Alma S.*, 244 Ariz. at 162 ¶ 38, is subordinate the interests of the child to those of the parent once a determination of unfitness has been made. Indeed, *Santosky* recognized that once such a finding has been made, the parent and child no longer "share a vital interest in preventing erroneous termination of their natural relationship," and "the court may assume . . . that the interests of the child and the natural parents do diverge." 455 U.S. at 760; *see also Demetrius L.*, 239 Ariz. at 4 ¶ 15; *Kent K.*, 210 Ariz. at 286 ¶ 35.

**¶16**      The court of appeals further erred in its best-interests analysis by quoting *Roberto F.* to support its statement that the material issue in the best-interests inquiry is "whether a parent has the ability to properly parent

his/her child." *Alma S.*, 244 Ariz. at 157 ¶ 13. *Roberto F.* did not address best interests; it only addressed parental fitness. 232 Ariz. at 54 ¶ 41 n.14. By citing *Roberto F.*, the court of appeals conflated the fitness inquiry with the best-interests inquiry.

## IV. SUFFICIENCY OF THE EVIDENCE

**¶17**        Mother does not dispute that a statutory ground for termination was proven by clear and convincing evidence. She only contests the juvenile court's best-interests finding. Whether that finding is supported by sufficient evidence is the relevant inquiry here.

**¶18**        "We accept the juvenile court's findings of fact if reasonable evidence and inferences support them, and will affirm a severance order unless it is clearly erroneous." *Demetrius L.* 239 Ariz. at 3 ¶ 9. "The appellate court's role is not to weigh the evidence." *State v. Fischer*, 242 Ariz. 44, 52 ¶ 28 (2017); *see also Dominique M.*, 240 Ariz. at 98 ¶ 9 ("Mother is in essence asking us to reweigh the evidence presented to the juvenile court. We decline to do so."). The resolution of conflicting evidence is "uniquely the province of the juvenile court," *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002), and this rule applies even when "sharply disputed" facts exist, *In re Pima Cty. Severance Action No. S-1607*, 147 Ariz. 237, 239 (1985).

**¶19**        The court of appeals erred in failing to abide by these standards and instead reweighing the evidence presented to the juvenile court. For example, the court disbelieved Father's statement to his therapist that he and Mother were still in a relationship, rejected the juvenile court's findings consistent with Father's statement, and concluded that Father did not pose a danger to the children because he was "no longer present in [their] lives." *Alma S.*, 244 Ariz. at 158 ¶¶ 16–17, 160 ¶ 27. The court of appeals also asserted that the juvenile court "did *not* find that Mother and Father were still in a relationship." *Id.* at 158 ¶ 17. But the juvenile court did not find that Mother and Father's relationship had ended, nor did it question Father's credibility. In fact, the juvenile court appeared to question the truth of *Mother's* assertion that her relationship with Father had ended, stating:

> Only recently has Mother said that she is no longer with Father. However, Father has said otherwise to his therapist.

> *Even if the Court accepts Mother is being honest* and she is no
> longer in a relationship with Father, it is literally too little too
> late to demonstrate that she is willing to protect her children
> from an abusive person.

(emphasis added). Further, in its best-interests ruling, the juvenile court
reasoned that "[w]hile Mother loves her sons, she chose to continue her
own unhealthy, abusive relationship with Father . . . rather than ending the
relationship to protect herself and her children."

¶20            The court of appeals also reevaluated the testimony of
Mother's DCS case manager, finding that the case manager's "casual
inquiry into the facts is not sufficient to meet even minimal professional
standards" and that the psychologist's conclusions were "equally
unfounded" and possibly "so lacking" that his testimony should have been
inadmissible. *Id.* at 158–60 ¶¶ 20–24. But the record supported the juvenile
court's factual findings and conclusions. For example, the DCS case
manager reviewed Mother's case file, set up DCS services for Mother, and
exchanged communications with Mother. Similarly, the psychologist
conducted a five-hour psychological evaluation of Mother that included a
"thorough clinical interview" with her, several psychological tests, and a
review of DCS records, and drew his conclusions from his expertise.

¶21            Viewing the record in the light most favorable to upholding
the court's best-interests finding, *Demetrius L.*, 239 Ariz. at 2 ¶ 2, and
applying our deferential standard of review, *see id.* at 3 ¶ 9, we conclude
that sufficient evidence supports that finding. Both of Mother's children
were excelling in their out-of-home placements, the foster parents were
planning to adopt the children, and the children are otherwise adoptable
even if their current placements do not result in adoption. The juvenile
court also found, as part of its consideration of the totality of the
circumstances in its best-interests analysis, that Mother was still inclined to
endanger the children despite her rehabilitative progress.

¶22            Justice Bolick concurs in the result in this case, but unlike
Mother, he questions the constitutionality of Arizona's termination of
parental rights statutory scheme. Because Mother did not challenge the
constitutionality of the statute, this issue is not before us and we decline to
address it. *See, e.g., State v. City of Tucson*, 242 Ariz. 588, 599 ¶ 45 (2017) ("We
generally do not reach out to decide important constitutional issues or to

upset established precedent when no party has raised or argued such issues.").

## V. CONCLUSION

**¶23** We vacate the court of appeals' opinion and affirm the juvenile court's judgment terminating Mother's parental rights.

¶24 I agree with my colleagues that, applying an abuse of discretion standard to the juvenile court's decision, the statutory grounds for termination of parental rights were met here. I concur only in the result and write separately because our statutes and rules, as the Court has interpreted and applied them here and elsewhere, do not adequately safeguard fundamental parental rights.

¶25 The primacy of parents in the upbringing of their children is a bedrock principle of American constitutional law. *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents . . . ."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality) ("[T]he interest of parents in the care, custody, and control of their children [] is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (listing cases). The principle of parental sovereignty is one that has distinguished our exceptional nation from authoritarian regimes. *See, e.g.*, Aaron T. Martin, *Homeschooling in Germany and the United States*, 27 Ariz. J. Int'l. Comp. L. 225 (2010) (tracing Germany's prohibition of homeschooling to Nazi regime); Nicole M. Skalla, *China's One-Child Policy: Illegal Children and the Family Planning Law*, 30 Brook. J. Int'l L. 329 (2004) (discussing China's prior one-child policy); Aleta Wallach, *Comparative Legal Status of American and Soviet Women*, 5 Val. U. L. Rev. 439, 479 (1971) (reporting that Soviet policy requires that parents "must bring up their children in the spirit . . . of communism").

¶26 With those rights come deep responsibilities, and failing to fulfill those responsibilities can lead to forfeiture of the rights. But the permanent severance of the parental relationship is a power of awesome magnitude that must be exercised with great rectitude and always cognizant of the fundamental rights at stake. The United States Supreme Court could not have established this principle more strongly. "The fundamental liberty interest of natural parents in the care, custody, and management of their child is protected by the Fourteenth Amendment, and does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). Parents faced with "irretrievable destruction of their family life" have a "critical need for procedural protections." *Id.* Thus, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Id.* at 753–54.

¶27 Our statutes and rules as interpreted and applied by this Court do not always measure up to the demanding constitutional requirements. *See Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 449–51 ¶¶ 44–54 (2018) (Timmer, J., dissenting) (holding that a parent who is late to a hearing may lose important rights); *Marianne N. v. Dep't of Child Safety*, 243 Ariz. 53, 1008–13 ¶¶ 33–66 (2017) (Eckerstrom, J., dissenting) (holding that a parent who appeared at fourteen consecutive hearings and who failed to appear but attempted to participate telephonically in a status conference can have the proceeding converted to a final termination hearing and lose her children).

¶28 Termination proceedings in Arizona nearly always result in permanent severance of parental rights. According to Department of Child Safety ("DCS") statistics, from October 2007 to March 2008, petitions for termination encompassed 510 children, and 484 severances were granted. Ariz. Dep't of Econ. Sec., *Child Welfare Reporting Requirements: Semi-Annual Report for the Period of October 1, 2007 Through March 31, 2008*, at 61 (2008). From April to September 2017, ten years later, the number of petitions increased markedly to 3,097, and 3,095 (99.94%) were granted. Ariz. Dep't of Child Safety, *Child Welfare Reporting Requirements: Semi-Annual Report for the Period of April 1, 2017 Through September 30, 2017*, at 68 (2017). These statistics by themselves do not demonstrate that deficiencies exist in individual cases. They do, however, counsel that we should take great care to ensure that our termination of parental rights process has not become a railroad with no stops and only one destination, in which judges act as mere conductors.

¶29 As the Court recognizes, we have typically applied a bifurcated process in termination proceedings, determining in the first stage whether one of the statutory grounds for termination was proved by clear and convincing evidence, and in the second stage whether termination is in the best interests of the child by preponderance of the evidence. *Supra* ¶ 8. This bifurcated process does not appear on the face of the statute, which instead directs that "in considering any of the . . . grounds" for termination, "the court shall also consider the best interests of the child." A.R.S. § 8-533(B); *see Kent K. v. Bobby M.*, 210 Ariz. 279, 286 ¶ 32 (2005). Given that the statute treats termination grounds and the child's best interests as part of the same analysis, the Court aptly today instructs that the juvenile court "must consider the totality of the circumstances." *Supra* ¶ 1.

¶30        A glaring omission from the statute, from a due process perspective, is its failure to expressly require consideration of a parent's rehabilitation where the statutory ground for termination does not necessarily suggest permanent unfitness. A.R.S. § 8-533(D) provides that "the court shall consider the availability of reunification services to the parent and the participation of the parent in these services," but only as to § 8-533(B)(8) and (11) — where child is cared for in a supervised out-of-home placement and reunification services have been provided. By contrast, in *Santosky*, the state was required in the neglect context to make diligent efforts to encourage and strengthen the parental relationship. 455 U.S. at 748. Indeed, the dissenters emphasized that the "central purpose of the New York plan is to reunite divided families." *Id.* at 771 (Rehnquist, J., dissenting). No such explicit requirement either on the state's part to engage in such efforts, nor on the juvenile court's part to consider such efforts, is present in Arizona's statutory scheme.

¶31        Our court of appeals has long recognized this due process prerequisite. In *Mary Ellen C. v. Arizona Department of Economic Security*, the court of appeals held that in addition to proving a statutory ground, the state must prove "an additional element"; specifically, whether it "made reasonable efforts to preserve the family relationship[.]" 193 Ariz. 185, 191 ¶ 28 (App. 1999). The court explained that this inquiry is not statutory but is required "on constitutional grounds as a necessary element" of any termination proceeding by *Santosky*. *Id.* at 192 ¶ 32; *accord Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 49 ¶ 15 (App. 2004). As my colleague, then-Judge Gould, aptly described it in *Roberto F. v. Arizona Department of Economic Security*, "In any severance proceeding, the material issue facing the court is whether a parent has the ability to properly parent his/her child; it is irrelevant whether a child has a stronger attachment to their foster parents, whether foster parents are more 'nurturing,' or whether foster parents might be more capable or better parents than a natural parent." 232 Ariz. 45, 54 ¶ 42 (App. 2013).

¶32        However, the Court today holds that all that must be proven by clear and convincing evidence is that the parent engaged in one of the statutory grounds for termination, which by itself "constitute[s] a finding of parental fitness." *Supra* ¶ 11. The Court acknowledges that "the parent's rehabilitation" should be part of the "totality of the circumstances" that a

12

court must consider in a termination proceeding. *Supra* ¶ 1. However, it errs significantly by failing to accord proper weight to that central consideration, reducing it from an essential element in proving unfitness to merely considering it as one part of the child's best-interests determination, where it is subordinate to other priorities.

**¶33** That holding is at odds with *Santosky*, in which the statutory scheme before the Court required the state in the parental unfitness stage to prove, among other things, "the intensity of its agency's efforts to reunite the family." 455 U.S. at 762. Proof of the state's efforts, *combined* with proof of the parent's failings, both by clear and convincing evidence, "not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children." *Id.* at 760. Here, by contrast, the Court rules that proof of the statutory ground, standing alone, proves unfitness, without a finding either that the state has made diligent efforts to reunify the family or that the parent has failed to remediate the problem. *Supra* ¶¶ 9, 11; *see also supra* ¶ 10 (statutory grounds are "proxies for parental unfitness").

**¶34** Relegating parental rehabilitation to the best-interests inquiry bodes serious ramifications that eviscerate the parent's fundamental rights. The statutory grounds may reflect a moment in time, or unique circumstances, that justify removal of the child from the home but may not reflect permanent or even ongoing unfitness. The unfitness determination cannot properly be made without considering the state's reunification efforts and the parent's success in regaining or attaining parenting skills. *See, e.g.*, *A.M. v. A.C.*, 296 P.3d 1026, 1035 ¶ 29 (Colo. 2013) ("Before terminating the parent-child relationship, the trial court must consider and eliminate less drastic alternatives, . . . and the parents must be given the opportunity to rehabilitate through participation in a treatment plan . . . ." (citations omitted)). Once the case moves to the dispositional stage, the parent's rights are, at best, only one factor among many; for as the Court observes, in the best-interests inquiry, the child's "stability and security" are the "primary concern." *Supra* ¶ 12.

**¶35** Additionally, consideration of parental rehabilitation during the dispositional stage reduces significantly the state's burden, from clear and convincing evidence to preponderance of the evidence. Here, Mother's relationship with her children was permanently severed despite the fact that she received extensive rehabilitation services, and that DCS and the

guardian ad litem agreed that Mother maintained a bond with her children and possessed adequate parenting skills. Although such considerations are important in determining a child's best interests, they are also central in making the predicate determination that the parent is unfit.

¶36　　　　Indeed, as the Court observes, once unfitness is determined, the best-interests standard is satisfied upon a showing that the child will benefit from severance or will be harmed if severance is denied. *Supra* ¶ 13. Considering rehabilitation in that context, rather than as an essential element in proving unfitness, strips the parent's rights of their fundamental nature because the interests of the parent and child are presumed to diverge and the child's interests are paramount.

¶37　　　　The Court goes on to declare that "what courts must not do, and what the court of appeals did here, . . . is subordinate the interests of the child to those of the parent once a determination of unfitness has been made." *Supra* ¶ 15. But that is not what the court of appeals said or did. Rather, the court of appeals stated that "[i]f a parent's ability to parent the children has been established by parent-aide services, there is a bond between the children and parent, and the parent has attained a safe and stable living situation, then the children's adoptability, household stability, and the ability of their current placements to meet their needs are subordinate to the fundamental rights of the parent in determining best interests, unless severance removes a detriment caused by the parental relationship." *Alma S.*, 244 Ariz. at 162 ¶ 38. In other words, if a parent has rehabilitated, the parent's rights generally remain paramount. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 304 (1993) ("'[T]he best interests of the child' is not the legal standard that governs parents' or guardians' exercise of their custody: So long as certain minimum requirements of child care are met, the interests of the child may be subordinated . . . to the interests of the parents or guardians themselves.").

¶38　　　　Mother has not argued that the statutes violate the Constitution on their face or as applied. Because the juvenile court considered the state's rehabilitation efforts and determined that the children remain at risk if reunited with Mother, and because we review that decision only for abuse of discretion, I join my colleagues in affirming the termination. However, the framework for terminating parental rights articulated by the Court here does not provide the "fundamentally fair procedures" that the Constitution requires.

¶39      For many if not most people who are fortunate enough to be parents, the loss of their children is far graver than any possible loss of liberty.  It may very well be that the vast majority of parents against whom DCS files termination proceedings deserve ultimately to lose their children.  But the framework set forth by the Court today and in other recent decisions allows for the very real possibility that parents who have rehabilitated themselves, who have followed our cumbersome rules to the best of their ability, who have retained a strong familial bond, and who have manifested the ability to parent, will nonetheless lose their children irrevocably.  That is not only constitutionally impermissible but intolerable in a free society.