NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

KYLE R., DAWNA-JO H., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, J.R., A.R., *Appellees.*

No. 1 CA-JV 22-0048
FILED 10-11-2022

---

Appeal from the Superior Court in Maricopa County
No.  JD532906, JS519831
The Honorable Joshua D. Rogers, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Kyle R.*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Dawna-Jo H.*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellees*

_____

**MEMORANDUM DECISION**

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Vice Chief Judge David B. Gass joined.

_____

**B A I L E Y**, Judge:

**¶1**　　　　Kyle R. ("Father") and Dawna-Jo H. ("Mother") appeal the superior court's order terminating their parental rights to their children. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**　　　　Father and Mother are the parents of J.R., born in 2019, and A.R., born in 2021. They have extensive histories with the Department of Child Safety ("DCS") and have received services from the Department of Developmental Disabilities ("DDD") for their behavioral health needs. The court terminated the parents' parental rights to three other children in the past because, despite reunification services, they remained unable to safely parent them. In past psychological evaluations, both parents were diagnosed with mental deficiencies and mental-health issues.

**¶3**　　　　Mother's evaluations determined she had borderline intelligence and mental retardation; attention-deficit hyperactivity, post-traumatic stress, reactive attachment, mood disorders, and schizophrenia. Mother had a history of suicide attempts. Father accrued diagnoses of partial fetal alcohol syndrome, an alcohol-related neurodevelopmental disorder, depressive disorder, and a personality disorder with antisocial and narcissistic traits. Additionally, Father had an active warrant for charges of defacing or damaging property and disorderly conduct involving domestic violence.

**¶4**　　　　Because of this history, DCS investigated after Mother gave birth to J.R., who was placed in the neonatal intensive care unit because of respiratory and feeding problems. After his release from the hospital, he continued to struggle with respiratory conditions and required breathing treatments.

**¶5**　　　　The parents were not enrolled in services to treat their mental health or support their cognitive limitations. After the investigator came to the parents' home, she said "it quickly became evident . . . that [Father and

Mother] do not have the basic knowledge, skill set, or means to provide for [J.R.'s] basic needs and ensure his safety."

¶6 In October 2019, DCS filed a dependency petition and placed J.R. with an aunt; after a contested adjudication, the superior court found him dependent in March 2020, adopting a family reunification case plan. At a December 2020 review hearing, the court changed the case plan to severance and adoption. In January 2021, DCS moved to terminate the parents' parental rights to J.R. under the six- and fifteen-month out-of-home placement grounds and under the additional ground of mental illness as to Mother. Arizona Revised Statutes ("A.R.S.") § 8-533(B)(3), (B)(8)(a), (c). DCS also took custody of A.R. after her birth and immediately filed dependency and termination petitions under the mental illness ground. A.R.S. § 8-533(B)(3).

¶7 DCS asked the parents to pursue mental health services through their own providers, and both parents indicated they could do so. Mother obtained mental health services, including counseling and medication and case management. She made little improvement in counseling, however, and was discharged for failing to attend appointments consistently. She also completed a psychiatric evaluation and was diagnosed with bipolar disorder with the current episode listed as severely manic with "psych features"; autism spectrum disorder; and post-traumatic stress disorder. Father refused to participate in mental-health services and denied he needed them.

¶8 Meanwhile, DCS referred the parents for psychological evaluations, the Nurturing Parenting Program, and parent aides with visitation. The parents refused to complete the psychological evaluations. Additionally, after two parent aides, they still were not retaining the lessons and had made only a few improvements in their ability to parent. DCS also asked Father to self-refer for anger management services, but he refused.

¶9 After a two-day adjudication in December 2021, the superior court terminated the parents' parental rights on the grounds alleged, as well as the neglect ground as to A.R. The parents appealed. This Court has jurisdiction under A.R.S. § 8-235(A).

## DISCUSSION

¶10 The parents challenge the court's order terminating their rights to A.R. based on neglect and the court's finding that DCS made diligent efforts to provide them with appropriate reunification services.

3

Additionally, Father challenges the evidence supporting the termination order of his parental rights to A.R. based on the mental illness ground.

**¶11**      A parent's right to custody and control of his own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). Severance of a parental relationship may be warranted where the state proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* at 249, ¶ 12. "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005). The court must also find that severance is in the child's best interests by a preponderance of the evidence. *Id.* at 288, ¶ 41.

**¶12**      This court "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings and will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002). This Court does not reweigh the evidence, but "look[s] only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

### I.      Neglect Ground.

**¶13**      The parties agree the superior court erred by terminating the parents' rights to A.R. under the neglect ground because DCS never alleged that ground in its motion. We, therefore, do not consider that ground. *See Roberto F. v. Ariz. Dep't of Econ. Sec.*, 232 Ariz. 45, 55, ¶ 44 (App. 2013) ("Adequate notice is a fundamental element of due process.").

**¶14**      But we will affirm the superior court's order terminating parental rights if reasonable evidence supports any of the statutory grounds on which the court ordered termination. *See Jesus M.*, 203 Ariz. at 280, ¶ 3. Thus, although it was error for the court to terminate the parents' rights to A.R. under the neglect ground, reasonable evidence supports its order terminating the parents' rights on other statutory grounds.

### II.      Diligent Efforts.

#### a.   Waiver.

**¶15**      Both parents assert that DCS failed to make a diligent effort to provide them with appropriate reunification services. Before seeking to terminate parental rights under the mental illness ground, DCS must make reasonable efforts to provide a parent with appropriate reunification

services, *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 186, ¶ 1 (App. 1999), and before seeking termination under the out-of-home ground must make diligent efforts to provide appropriate reunification services. A.R.S. § 8-533(B)(8). DCS does so by allowing the parent the "time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at 192, ¶ 37. DCS must "undertake measures [that have] a reasonable prospect of success" in reuniting the family. *Id.*, at 192, ¶ 34. Additionally, DCS must "maintain consistent contact with the parent[] and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 23, ¶ 50 (App. 2019). Nonetheless, it is not required "to undertake rehabilitative measures that are futile," *Mary Ellen C.*, 193 Ariz. at 192 ¶ 34, or to duplicate a service the parent receives elsewhere. *See Pima Cnty. Severance Action No. S-2397*, 161 Ariz. 574, 577 (App. 1989).

¶16 DCS contends the parents waived this argument by failing to raise it before trial. *See Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014) (holding a parent may waive concerns about services if not timely raised in superior court). Here, the court found that "although both parents have contested the necessity of services, they have not challenged the adequacy of the services provided or offered by" DCS. Indeed, the parents failed to object to the superior court's several findings throughout the case that DCS was making reasonable efforts to finalize the permanency plan.

¶17 They suggest this Court can deem their counsels' cross-examination of the case manager at trial an objection to DCS's efforts to provide services. Additionally, the record shows that Mother objected to the court's reasonable-efforts finding once, on the first day of trial. But the dependency process "demands that parents voice their concerns about services to the juvenile court in a timely manner" to allow that court "a reasonable opportunity to address the matter and ensure" DCS follows its statutory obligation. *Id.* at 178-79, ¶16, ¶18. Here, the parents' failure to timely object or voice concerns regarding services deprived the superior court of a reasonable opportunity to address any issues before trial. Nevertheless, given the important rights at stake in termination proceedings, we decline to apply waiver here. *See id.* at 178, ¶ 14 (noting a parent may raise reunification services issues at trial).

### b. Mother.

¶18 Turning to the merits, Mother received several services during the dependency, including a psychological evaluation, a

BioPsychoSocial assessment, a psychiatric evaluation, medication management, mental health and DCS case management, individual counseling, anger management counseling, the Nurturing Parenting Program, parent aides with visitation, habilitation services, and transportation assistance.

**¶19**     Nonetheless, Mother argues the case manager referred her to other agencies for counseling and failed to regularly contact those agencies about her progress or assist her "when it was clear that she was not receiving" that service.  DCS is not required to duplicate services, however.  *See S-2397*, 161 Ariz. at 577.  Here, Mother had counseling available through her mental health provider from January 2020 to March 2021.  Yet, in that time, she attended only a few sessions.

**¶20**     She then changed her mental health service provider in Summer 2021 because she felt she could receive better services elsewhere.  Thus, for about four months, Mother was not receiving mental health services.  Although Mother maintained contact with the case manager during this time, she did not indicate any issues with the transfer or request any help.  Moreover, the case manager scheduled at least one meeting with Mother during this time, but she did not show up.

**¶21**     Regardless, Mother had a case manager through her medical insurance who was overseeing the transfer.  Mother testified that this case manager had to handle the transfer so services would be covered through her insurance.  Once Mother began services with the new provider, she was waitlisted for counseling.  Nonetheless, she told the DCS case manager the opposite—that she was receiving and participating in counseling.  Thus, even if DCS should have been more diligent in contacting Mother's mental health case manager, on this record, we find no error.

**¶22**     Next, Mother asserts that DCS failed to provide her with another psychological evaluation after December 2019.  Mother, however, refused to finish the psychological evaluation DCS had referred her for, despite several reminders by the case manager.  Additionally, Mother received similar assessments during the dependency, including a BioPsychoSocial and a psychiatric assessment.

**¶23**     Mother also points to a six-month gap between her parent aide referrals.  Absent a court order otherwise, DCS had an obligation to provide Mother with visitation.  *See Maricopa Cnty. Juv. Action No. JD-5312*, 178 Ariz. 372, 374-75 (App. 1994) (holding parents in dependency proceedings retain the right to associate with their children).

¶24        Here, the case manager testified that the gap was due to the "significant waiting list for [parent aides] at that time," but that DCS also had "a case aide . . . do a couple of visits in between because it was taking so long" to have a parent aide assigned.  On this record, we cannot say DCS's actions constitute a failure to provide Mother appropriate visitation services.  And parents did not raise this issue in the superior court.  Even so, Mother does not show how additional visits would have remedied her mental health issues or parenting deficits, particularly when she participated in the parent aide service after this time and only enhanced a few parenting skills.

¶25        Mother next argues the case manager waited almost a year to send her a letter detailing the services she needed to complete for reunification.  The record shows, however, that DCS was diligent in contacting and communicating with Mother in other ways about services.  Both case managers attempted several times to meet with the parents.  The second case manager maintained contact with the parents through text, e-mail, and voicemail and discussed service requirements often.  Moreover, DCS listed its service requirements in court reports, and services were discussed at regular court hearings.

¶26        Finally, Mother and Father dispute the case manager's testimony that their home was dangerous for children, arguing that DCS did not evaluate their current home.  But the superior court did not base its termination order on, or make any specific findings, regarding the condition of the parents' home.  And the case manager explained her testimony pertained only to the parents' first home.

### c.  Father.

¶27        Father likewise challenges whether DCS made a diligent effort to provide him with appropriate services, arguing it did not afford him enough time or opportunity to participate in anger management or counseling.  Additionally, he takes issue with the court's finding that DCS "referred [him] for domestic violence counseling and individual counseling to address mental health."  Although DCS did not provide Father with direct referrals, as the finding suggests, counseling was available to him, and he failed to engage.

¶28        Here, Father had the opportunity to participate in mental health services, a psychological evaluation, anger management counseling, case management services, the Nurturing Parenting Program, and parent aides with visitation.

¶29   Regarding mental health services specifically, Father initially had comprehensive mental health services and counseling available through his own provider, but he stopped engaging in them. Additionally, when Father indicated he was having trouble transferring his mental health services to another provider, the case manager offered to assist him, but he did not take advantage of the offer. DCS referred Father for a psychological evaluation shortly after the dependency began, but he refused to complete it, even with the case manager's repeated prompting. Had Father completed it, the evaluating psychologist could have recommended additional services, such as anger management or counseling, earlier in the dependency.

¶30   Regardless, when DCS finally asked Father to self-refer for counseling, he refused. Thus, Father contributed to the initial delay in services, and considering his refusal to participate in any mental health services, he has not shown how any alleged error by DCS would have affected the outcome of the case.

¶31   Father also generally asserts the case manager was not diligent in communicating with him about services. The record shows, however, that the first case manager met with the parents multiple times, though Father still claimed he did not know what services he needed to participate in. The record belies Father's claim, as he was prompted multiple times to complete the psychological evaluation and, during this time, he participated in the parent-aide service and visitation.

¶32   Once the second case manager took over, she attempted to meet with the parents eleven times to discuss services to no avail. The case manager also attempted to speak with Father over the phone, but he indicated he "didn't want to do any services." Moreover, although Father disagreed about whether he needed mental health services, he recognized DCS's request to participate in them because he informed the case manager about his difficulty in transferring the service. Overall, the record shows that Father understood what services he needed to engage in but refused to participate in most of them. *See Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (explaining DCS is not required to ensure parents participate in the services offered).

### III. Mental Illness Ground as to Father.

¶33   Finally, Father contends no reasonable evidence supports termination of his rights under the mental illness ground, arguing the order is based on an old psychological evaluation, dated DDD records, and the

case manager's testimony. The superior court may terminate a parent's rights if "the parent is unable to discharge parental responsibilities because of mental illness . . . and there are reasonable grounds to believe that the condition will continue for a prolonged indeterminate period." A.R.S. § 8-533(B)(3).

¶34 Father faults the court for relying on mental health reports that were at least four years old, but his own refusal to participate in mental health services during this case, including an updated psychological evaluation, prevented the court from relying on more current information.

¶35 Nevertheless, reasonable evidence supports the court's finding that Father suffers from mental illness that renders him unable to discharge his parental responsibilities and that his condition will continue for a prolonged, indeterminate period. Since childhood, Father has been repeatedly diagnosed with fetal-alcohol syndrome, which led to a neurodevelopmental disorder. In 2017, Father was diagnosed with a personality disorder with antisocial and narcissistic traits. That psychologist noted Father "was identified at an early age as having severe emotional problems," which escalated to physical aggression as he aged. She explained that as part of the personality disorder, Father "totally lacks empathy, does not care about other people, other than the role they play in meeting or thwarting his wants and desires. The world revolves completely around [Father], and although he is capable of registering other people's suffering, including that which he causes, he just doesn't care."

¶36 The psychologist concluded that Father "is totally unable to parent at this time. He does not see other people as human beings with names, identities, and valid needs separate from his own." For that reason, she opined that a child in Father's care would be at a huge risk of neglect and physical harm. Further, she found his prognosis for change as "very poor[] due to the ingrained and habitual nature of his distorted beliefs and poorly controlled impulses combined with his conviction that he is fine." As to services, the psychologist stated that Father "has been the unimpressed recipient for years of ongoing and intensive mental health resources . . . with very little to show for it." She could not identify any further services that would help Father.

¶37 The superior court considered this most recent psychological evaluation, and along with other evidence found:

> Father continues to exhibit the mental health issues set forth
> in the 2017 psychological evaluation[,] and . . . he has not

taken any steps to address these issues. Indeed, Father refused to complete the psychological evaluation for which he was referred in this case or even acknowledge that he has any mental health issues. He also continues to have almost all of the same diminished protective capacities as Mother.

¶38 To be sure, Father denied that he needed mental health assistance or had any mental health issues. He refused to participate in mental health services or to speak to the case manager about it. Additionally, Father displayed explosive anger during the dependency and rigidity, including refusing to be redirected after picking the children up by the wrists.

¶39 Similarly, the parent aide reported the parents' main barriers to progressing in the service was their resistance to change and unwillingness to control their emotions and impulses. After nine months of participating in the parent-aide service, Father had only enhanced two of sixteen parenting goals. He remained diminished in the following protective capacities: (1) controls impulses, (2) takes action, (3) sets aside his needs for the children, (4) demonstrates adequate parenting skills, (5) adaptability, (6) self-awareness, (7) intellectual ability, (8) recognize threats, (9) recognize the children's needs, (10) understand protective role, (11) articulate a protection plan, (12) meets own emotional needs, (13) tolerance, and (14) stability.

¶40 Father points to the two goals he did enhance: expressing love, empathy, and sensitivity to the children and being positively attached to them. Although the parent aide found Father had enhanced these skills, she noted continuing concerns in these areas, reporting that the parents "struggle[] with ordering their lives according to what is best for the child[ren], displaying their affection for the child[ren], and identifying the closeness of the relationship with the child[ren]." Overall, reasonable evidence supports the superior court's termination order. [1]

---

[1] Mother does not challenge the mental illness ground as to A.R. or the grounds alleged as to J.R., and Father does not challenge the grounds as to J.R. Any arguments as to those grounds are therefore waived. *See Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577-78, ¶ 5 (App. 2017).

**CONCLUSION**

¶41        For the foregoing reasons, we affirm.

